1

KESSLER TOPAZ MELTZER
   & CHECK, LLP

2

GEOFFREY C. JARVIS (*pro hac vice*)
MEGAN KONESKI (*pro hac vice*)

3

280 King of Prussia Road
Radnor, PA 19087

4

Tel:   (610) 667-7706
Fax:  (610) 667-7056

5

gjarvis@ktmc.com
mkoneski@ktmc.com

6

-and-

7

8

PAUL A. BREUCOP (Bar No. 278807)
One Sansome Street, Suite 1850
San Francisco, CA 94104

9

Tel:   (415) 400-3000
Fax:  (415) 400-3001

10

pbreucop@ktmc.com

11

*Counsel for Lead Plaintiff Jay Rabkin*
*and Lead Counsel for the Putative Class*

12

13

UNITED STATES DISTRICT COURT

14

NORTHERN DISTRICT OF CALIFORNIA

15

SAN FRANCISCO DIVISION

16

17

JAY RABKIN, Individually and on Behalf
of All Others Similarly Situated,

18

                Plaintiff,

19

      v.

20

LION BIOTECHNOLOGIES, INC.,
MANISH SINGH, MICHAEL
HANDELMAN, and
KAMILLA BJORLIN

21

22

          Defendants.

23

Case No. 3:17-cv-02086-SI

<u>CLASS ACTION</u>

AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

**DEMAND FOR JURY TRIAL**

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF THE ALLEGATIONS ................................................................ 2

II.   JURISDICTION AND VENUE .......................................................................... 6

III.  THE PARTIES ...................................................................................................... 7

     A.    Lead Plaintiff .............................................................................................. 7

     B.    Company Defendant ................................................................................... 7

     C.    Officer Defendants .................................................................................... 8

     D.    Lidingo Defendant ..................................................................................... 9

     E.    Related Parties ........................................................................................... 9

IV.  VIOLATIONS OF THE EXCHANGE ACT ..................................................... 10

     A.    Substantive Allegations ........................................................................... 11

           1.    Creation of the Stock Promotion Scheme ................................... 11

           2.    Singh Uses the Scheme for His Own Company - IMUC ............ 14

           3.    Galena Becomes an Early Customer of Lidingo ......................... 15

           4.    Singh Joins Lion ......................................................................... 15

           5.    Singh Immediately Incorporates Lion into the Stock Promotion
                Scheme in Order to Achieve the Lucrative Milestones in His
                Employment Contract .................................................................. 17

           6.    The Scheme Unravels ................................................................. 19

     B.    Defendants' Materially False and Misleading Statements and Omissions .......... 27

           1.    The Promotional Articles Were Materially False and Misleading
                When Published Because They Affirmatively Misstated and/or
                Omitted Material Facts ................................................................ 27

                 a.    The September 27, 2013 Promotional Article ................ 28

                 b.    The October 2, 2013 Promotional Article ..................... 30

                 c.    The October 18, 2013 Promotional Article ................... 32

                 d.    The October 31, 2013 Promotional Article ................... 33

                 e.    The November 12, 2013 Promotional Article ................ 34

                 f.    The November 25, 2013 Promotional Article ................ 36

g.     The December 2, 2013 Promotional Article.................................38

h.     The December 9, 2013 Promotional Article.................................39

i.     The December 23, 2013 Promotional Article...............................41

j.     The January 15, 2014 Promotional Article...................................42

k.     The February 6, 2014 Promotional Article...................................43

l.     The February 10, 2014 Promotional Article.................................44

m.     The February 18, 2014 Promotional Article................................46

n.     The March 1, 2014 Promotional Article.......................................46

2.     Defendants Made False and Misleading Statements in Lion's SEC Filings.............................................................................................47

a.     Defendants' January 2014 Offering Documents Were Materially False and Misleading...........................47

b.     The Company's November 14, 2013 Form 10-Q And SOX Certifications Were Materially False and Misleading ..................................................................49

c.     The Company's March 28, 2014 Form 10-K and SOX Certifications Were Materially False and Misleading ..................................................................50

d.     The Company's May 14, 2014 Form 10-Q and SOX Certifications Were Materially False and Misleading..................51

e.     The Company's September 11, 2014 Amended Registration Statement and September 30, 2014 Prospectus Were Materially False and Misleading ......53

C.     Additional Scienter Allegations .............................................................55

1.     Singh and Bjorlin's Direct Involvement in the Fraudulent Promotional Scheme Demonstrates Their Actual Knowledge .................55

2.     Lion, Singh, and Bjorlin Had Strong Financial Motives to Inflate the Price of the Lion's Shares.....................................................56

3.     The Promotional Scheme Affected One of Management's Core Concerns ...........................................................................................57

4.     Handelman's Position and the Small Size of the Company Support a Strong Inference that He Knew of the Promotional Scheme.................58

5.     Singh and Handelman's SOX Certifications Support a Strong Inference of Scienter.....................................................................58

D.     Applicability of the Presumption of Reliance .....................................60

| | E. | No Safe Harbor | 61 |
| | F. | Class Action Allegations | 61 |
| | G. | Loss Causation | 63 |
| | H. | Exchange Act Causes of Action | 69 |
| V. | | VIOLATIONS OF THE SECURITIES ACT | 74 |
| | A. | September 2014 Amended Registration Statement & Prospectus | 75 |
| | B. | Class Action Allegations | 76 |
| | C. | Securities Act Causes of Action | 77 |
| VI. | | PRAYER FOR RELIEF | 82 |
| VII. | | DEMAND FOR JURY TRIAL | 82 |

1
2
3
4
5
6

Lead Plaintiff, Jay Rabkin ("Plaintiff"), by his undersigned counsel, respectfully submits this Amended Complaint ("Complaint") alleging violations of the federal securities laws on behalf of himself and all other similarly situated persons or entities who purchased or otherwise acquired Lion Biotechnologies, Inc. ("Lion" or the "Company") common stock between September 27, 2013 and April 10, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

7
8
9
10
11
12
13
14
15
16

Plaintiff brings this class action to recover damages proximately caused to himself and the Class by Defendants' (defined below) violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Sections 11(a), 12(a)(2), and 15 and of the Securities Act of 1933 (the "Securities Act") against: (i) corporate Defendant Lion; (ii) former Lion President and Chief Executive Officer ("CEO") Manish Singh ("Singh"), who also controlled and operated stock promotion firm Lavos, LLC ("Lavos") from 2011 to 2014; (iii) former Lion Secretary and Chief Financial Officer ("CFO") Michael Handelman ("Handelman"); and (iv) Kamilla Bjorlin ("Bjorlin") the founder and owner of stock promotion firm Lidingo Holdings, LLC ("Lidingo") (collectively, "Defendants").

17
18
19
20
21
22
23
24
25
26

This Complaint is based upon Plaintiff's personal knowledge with respect to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation undertaken by Lead Counsel, which included, *inter alia*, the review and analysis of: (i) Lion's filings with the SEC; (ii) press releases and other public statements issued by Lion and the other Defendants; (iii) analyst, media and news reports about the Company; (iv) investigatory reports by Richard Pearson ("Pearson") of *Seeking Alpha* and Adam Feuerstein ("Feuerstein") of *TheStreet.com;* (v) documentary materials Lead Counsel obtained from the SEC's investigation into the Company, Lidingo, Lavos, and ImmunoCellular Therapeutics, Ltd. ("IMUC"), as well as the findings by the SEC based upon its investigation; and (vi) Lion's publicly-available trading data.

27
28

At all relevant times, Defendants either knew or were deliberately reckless in not knowing that: (i) Lion had retained the stock promotion firm Lidingo to tout the market price of

the Company's securities; (ii) Defendant Singh surreptitiously reviewed, edited, and approved the materially misleading articles and their content prior to their public dissemination; and (iii) the writers of the articles, who in many cases relied upon pseudonyms, were being paid to tout Lion's securities without disclosing payment. As a result of the foregoing, the Company's promotional articles, SEC filings, and other public statements were materially false and misleading.

## I.      SUMMARY OF THE ALLEGATIONS

1.      Lion is a developmental stage biotechnology company focusing on developing and commercializing cancer immunotherapy products, including its adoptive cell therapy regimen using autologous tumor infiltrating lymphocytes ("TIL").

2.      Defendant Singh was hired as Lion's CEO in July 2013, pursuant to an employment agreement that provided him with enormous personal financial incentives to ensure that Lion's share price and trading volume reached certain benchmarks. These incentives were not based upon the sustainable financial performance of the Company, but merely on the public perception of Lion's stock as reflected in its price and trading volume.

3.       These incentives led Lion and Defendant Singh to engage in conduct to promote Lion and its prospects in violation of the federal securities laws—conduct that was not curtailed by his fellow executives at Lion.

4.      Section 17(b) of the Securities Act requires online communications touting or recommending stocks to disclose the person or entity that paid for the communication, including the amount and type of payment. In a September 18, 2013 investor bulletin, the SEC explained that:

> **Paid Promoters:** Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for promotion, the amount, and the type of payment. But ***many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***.[1]
>
> (first emphasis in original)

---

[1]      All emphasis is added unless noted otherwise.

5.     The Defendants in this case were such fraudsters. Starting in July 2011, Singh started his own stock promotion company, Lavos, which conducted promotional work on behalf of pharmaceutical companies. One month later, Singh began working with Defendant Bjorlin, advising her on how to organize another stock promotion firm, Lidingo, to work with him on promotional projects for public companies.

6.     From 2011 through 2014, Singh and Bjorlin worked together through their firms Lidingo and Lavos to publish over 400 internet publications on behalf of at least eleven publicly traded companies, including companies where Singh was the CEO. During that time, Singh and Bjorlin paid writers, through Lidingo, to publish articles on investment websites like *Seeking Alpha* without disclosure of compensation. Bjorlin and Singh shared profits from the enterprise and received cash and equity of at least $1 million from the promotional scheme.

7.     In the fall of 2013, just two months after Singh became Lion's CEO, Lion and Singh retained Lidingo to initiate a campaign to tout Lion's prospects in order to boost the price of the Company's securities and its trading volume. As it had for years for other companies, Lidingo hired writers to draft news articles, which Singh edited and approved. As part of their well-established process of retaining writers and approving their articles for publication, Singh and Bjorlin instructed the Lidingo writers to falsely state that the authors were not paid for writing the articles and refused to deal with writers who sought to comply with the law and disclose that they were being paid by Lion for their articles. Lidingo writers then published the misleading articles on investor websites, like *Seeking Alpha*, touting Lion's success, thereby driving trading volume and share price.

8.     The articles were published under a variety of bylines—either the actual names of the third parties who were recruited to draft the articles, or fake pseudonyms created by Lidingo.[2] The pseudonyms included, "The Swiss Trader," "Glen S. Woods," and "John Rivers." In at least

---

[2]     This conduct occurred with respect to Galena and CytRX as well as Lion.  *See* Galena Report at 24; *see also* "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions" written by Feuerstein, published on *TheStreet* on February 12, 2014; *see also* "Behind the Scenes with Dream Team, CytRx, and Galena," written by Pearson, published on *Seeking Alpha* on March 13, 2014.

one instance, Lidingo writer Brian Nichols monitored the comments section of one of his articles on *Seeking Alpha* and responded to questions about Lion, working to ensure the message there expressed a positive opinion of Lion and Singh.

9.      Combined, Defendants published at least fourteen misleading articles about Lion online between September 2013 and March 2014, significantly altering the total mix of information in the marketplace about Lion. Reasonable investors reading the paid articles would have found it important to their investment decision to know that Lion had solicited the articles, and that they were not the work of persons who legitimately had an interest in Lion, but instead were the work of paid writers. In addition, any reasonable investor reading the Company's SEC filings would have expected to know that Lion had not only paid a third party to tout the Company's stock, but that the Company's own CEO had been actively involved in surreptitiously editing and approving the materially misleading promotional articles prior to their publication.

10.      All of the misleading promotional articles described in detail in Section IV.B *infra*, concealed that Lion had solicited and paid for the articles. Indeed, all the articles published on *Seeking Alpha* (excluding its Instablog) affirmatively state, just below the title, "***I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it.***" Anyone clicking a link to or viewing any published *Seeking Alpha* article would see this disclosure. The promotional campaign orchestrated by Singh, Bjorlin and Lion was a per se violation of the federal securities laws, which mandate that stock promoters disclose all compensation they have received.

11.      Lion also made false statements under its own name. In a registration statement, amendments thereto, and prospectus filed with the SEC between December 2013 and January 2014, as well as other later filings with the SEC, Lion failed to disclose that it had hired Lidingo to publish paid promotional articles that falsely purported to be unpaid and independent.

12.      The scheme began to unravel in February 2014, when Feuerstein, a senior columnist at the website *TheStreet.com*, reported on several articles on the finance website *Seeking Alpha* that had recommended shares of another biotechnology company, Galena Biopharma, Inc. ("Galena"). In a February 12, 2014 article, Feuerstein noted that *Seeking Alpha*

had removed these articles and concluded that the articles were written by the same person, albeit under different aliases. Feuerstein further suggested that Galena had paid a stock promotion firm named The DreamTeam Group, LLC ("DreamTeam") to write articles that helped triple Galena's share price while its CEO unloaded shares.

13.     After Feuerstein's article was published, the SEC instituted an investigation into Galena and its use of undisclosed stock promotion firms. Galena was initially contacted by the SEC in or about mid-February 2014. Lidingo was one of Galena's stock promotion firms and learned of the SEC investigation. Lidingo then ceased its practice of placing paid promotional articles on investment websites on or about March 10, 2014.

14.     Shortly thereafter, on March 13, 2014, Pearson, a frequent blogger on *Seeking Alpha*, also published an extensive article that detailed the promotional schemes at Galena and another biopharmaceutical company, the CytRx Corporation ("CytRx"). Through undercover investigative work, Pearson discovered that Galena and CytRx were approving and editing promotional articles, but prohibiting authors from disclosing the companies' payments.

15.     Then, on March 27, 2014, *Seeking Alpha* published an editorial apologizing to its readers entitled, "What Seeking Alpha Is Doing to Prevent Paid Stock Promotion." Eli Hoffmann, *Seeking Alpha's* editor-in-chief explained:

> Recently, our editors were forced to remove a number of articles from Seeking Alpha after we discovered that their authors had been compensated by stock promoters to publish positive articles on specific stocks. In their disclosures, the authors lied—explicitly stating that they were not receiving third-party payment for their articles. To be clear: Seeking Alpha does not allow paid stock promoters or IR firms to submit articles about stocks to which they have a relationship.

16.     On May 14, 2014, Lion disclosed that it had received a subpoena on April 23, 2014, from the SEC related to its investigation into Galena, requesting communications between anyone at the Company and certain investor-relations firms, as well as any articles about the Company posted on financial websites. Upon this news, shares of Lion fell $1.00 per share, or -10%.

17.     On the same day, Feuerstein published an article in *TheStreet* explaining how Lion might be connected to the Galena fraud. In the article, Feuerstein noted that Singh had previously

been the CEO of IMUC, which had hired DreamTeam, the same firm Galena used to publish paid promotional articles. Moreover, Feuerstein noted that Lion and Galena both shared Sanford Hillsberg as a board member.

18.     Based upon Feuerstein's and Pearson's reporting, Galena's board of directors formed a special committee to investigate the merits of the articles, among other things. The special committee issued a Report to the Board of Directors of Galena Biopharma, Inc. Regarding the 2012-2014 Market Visibility Campaigns and the Sales by Insiders in the First Quarter of 2014 (the "Galena Report") on July 15, 2014.

19.     Just six months later, on November 12, 2014, during aftermarket hours, Lion issued a press release entitled "Lion Biotechnologies Announces Management Change," announcing the resignation of Defendant Singh. Lion's share price declined by $0.75 per share, or over 11%.

20.     On November 14, 2014, *Seeking Alpha* writer Pearson published an article entitled, "More Fallout From Stock Promotion Scandal," tying Galena's stock promotion scheme involving Lidingo and Bjorlin to Singh's resignation from Lion.

21.     Finally, on April 10, 2017, the SEC revealed that:

> From September 2013 to March 2014, Lion, through its former Chief Executive Officer, Manish Singh, engaged in a scheme to mislead investors by commissioning over 10 internet publications . . . promoting Lion to potential investors that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish articles about Lion on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. Singh actively participated in Lidingo's promotional work for Lion and understood that Lidingo was using writers who would not disclose that Lion was indirectly compensating them for their publications.

22.     Following this news, shares of Lion fell $0.20 per share, or over 3%, to close at $6.35 per share on April 10, 2017. In total, Lion's shareholders lost potentially hundreds of millions of dollars as a result of the fraud perpetrated by Defendants.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 11(a), 12(a)(2) and 15 of the Securities Act (15 U.S.C. §77k) and Sections 10(b) and 20(a)-(b) of the Exchange Act, (15

1  U.S.C. §78j(b), §78t(a) and §78t(b)), and Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R.

2  §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28

3  U.S.C. §1331, Section 22 of the Securities Act and Section 27 of the Exchange Act.

4        24.     Venue is proper in this District pursuant to Section 22 of the Securities Act and

5  Section 27 of the Exchange Act. Lion's headquarters are located within this District, the

6  Company conducts substantial business in this District and many of the acts and practices

7  complained of herein occurred in substantial part in this District.

8        25.     In connection with the acts, conduct, or other wrongs alleged in this Complaint,

9  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

10  including but not limited to, the United States mail, interstate telephone communications and the

11  facilities of the national securities exchange.

12  **III.    THE PARTIES**

13      **A.**    <u>**Lead Plaintiff**</u>

14        26.     Lead Plaintiff Jay Rabkin purchased Lion securities during the Class Period as

15  described in the certification attached hereto as Exhibit A, and incorporated herein by reference,

16  and suffered damages thereon.

17      **B.**    <u>**Company Defendant**</u>

18        27.     Lion was a Nevada corporation during the Class Period with its principal

19  executive offices located at 999 Skyway Road, Suite 150, San Carlos, California 94070. During

20  the Class Period, Lion's common stock traded under the symbol "LBIO." Lion has since

21  reincorporated in Delaware. On June 27, 2017, Lion changed its name to Iovance

22  Biotherapeutics, Inc., which trades on the NASDAQ under the symbol "IOVA." Lion has settled

23  related charges that the SEC brought against it arising out of the facts alleged herein. Lion has

24  agreed to cease and desist from violating Sections 17(a) and 17(b) of the Securities Act, and

25  Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Additionally, Lion

26  has agreed to pay a $100,000 civil penalty to the SEC.

27

28

## C.     Officer Defendants

28.     Defendant Singh was CEO of Lion from July 24, 2013 to December 31, 2014, and served as its President and Chairman of the Board of Directors from July 2013 until August 20, 2014. From 2011 to 2014, Singh controlled the stock promotion firm Lavos and helped direct the activities of stock promotion firm Lidingo. During the Class Period, Singh signed: (i) the Form 10-Q filed on November 14, 2013 (the "November 14, 2013 Form 10-Q"); (ii) the Form 10-K filed on March 28, 2014 (the "March 28, 2014 Form 10-K"); (iii) the Form 10-Q filed on May 14, 2014 (the "May 14, 2014 Form 10-Q"); (iv) the Sarbanes-Oxley Act of 2002 ("SOX") Certifications filed on November 14, 2013, March 28, 2014, and May 14, 2014; (v) the Form S-1 Registration Statement filed on December 4, 2013 (the "December 4, 2013 Registration Statement"); (vi) Amendment No. 1 to Form S-1 Registration Statement filed on January 7, 2013 (the "January 7, 2013 Amended Registration Statement"); (vii) Amendment No. 2 to Form S-1 Registration Statement filed on January 21, 2014 (the "January 21, 2014 Amended Registration Statement");[3] and (viii) the Post-Effective Amendment No. 1 to Form S-1 Registration Statement filed on September 11, 2014 (the "September 11, 2014 Amended Registration Statement").[4] Singh has settled related charges the SEC brought against him arising out of facts alleged herein. He has agreed to cease and desist from violating Sections 17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Additionally, Singh has agreed to pay disgorgement of $1,750,000, prejudgment interest of $151,676.94 and a civil monetary penalty of $1,000,000 to the SEC. For five years after the entry of the SEC's cease-and-desist order, Singh is barred from participating in any offering of a penny stock, and he is prohibited from acting as an officer or director of any issuer that has a class of securities issued under Section 12 of the Securities Act.

---

[3]     The Prospectus filed on January 30, 2014 (the "January 30, 2014 Prospectus") became part of the December 4, 2013 Registration Statement and the January 7, 2014 and January 21, 2014, amendments thereto.

[4]     The Prospectus filed on September 30, 2014 (the "September 30, 2014 Prospectus") became part of the December 4, 2013 Registration Statement and the January 7, 2014, January 21, 2014, and September 11, 2014, amendments thereto.

29.     Defendant Handelman served as the CFO and Secretary of Lion between February 7, 2011 and June 8, 2015. During the Class Period, Handelman signed: (i) the November 14, 2013 Form 10-Q; (ii) the March 28, 2014 Form 10-K; (iii) the May 14, 2014 Form 10-Q; (iv) the SOX Certifications filed on November 14, 2013, March 28, 2014, and May 14, 2014; (v) the December 4, 2013 Registration Statement; (vi) January 7, 2013 Amended Registration Statement; (vii) the January 21, 2014 Amended Registration Statement; and (viii) the September 11, 2014 Amended Registration Statement.

### D.     Lidingo Defendant

30.     Defendant Bjorlin is an actress who is also known by her stage name Milla Bjorn. Bjorlin organized and operated Lidingo since at least September 2011, and through at least March 2014. She directed Lidingo's stock promotion services on behalf of publicly-traded issuer clients, including Lion. Between September 2011 and March 2014, Defendant Bjorlin corresponded extensively with Singh.

### E.     Related Parties

31.     Lavos was formed in Nevada in 2011. From 2011 to 2014, Lavos, which was controlled and operated by Singh, provided promotional services in conjunction with Lidingo to issuer clients. Lavos has settled related charges the SEC brought against it. Lavos has agreed to cease and desist from violating Sections 17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

32.     Lidingo was a Nevada limited-liability company formed in 2011 and dissolved in 2014. During the Class Period, Bjorlin owned and operated Lidingo as the only member or managing member.

33.     IMUC is a publicly-traded Delaware corporation formed in 1987, under a different name. Between February 2008 and August 2012, Singh was the CEO of IMUC. From September 2011 to August 2012, IMUC paid Lidingo to provide stock promotion services. Singh engaged Lidingo to pay writers to publish articles about IMUC on investment websites. IMUC has settled related charges the SEC brought arising out of facts similar to those alleged herein. IMUC has agreed to cease and desist from violating Sections 17(a) and 17(b) of the Securities Act, and

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Moreover, the SEC has deemed it appropriate to impose sanctions on IMUC.

34.     Galena is a publicly-traded Delaware corporation formed in 2006. Galena paid Lidingo to perform stock promotion services. Galena has settled related charges the SEC brought against it arising out of facts similar to those alleged herein. Galena has agreed to cease and desist from violating Sections 17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Moreover, the SEC has ordered Galena to pay a civil penalty of $200,000.

35.     Joel Corenman ("Corenman") was a paid writer for a Lidingo, publishing numerous articles on investment websites, including *Seeking Alpha*. Lidingo paid Corenman at least $18,000 for these articles. He wrote at least two articles concerning Lion under the pseudonym Glen S. Woods. Corenman has settled related charges the SEC brought against him arising out of facts alleged herein. He has agreed to cease and desist from violating Section 17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. He has also agreed to pay disgorgement of $18,000, prejudgment interest of $1,543.74, and a civil penalty of $25,000.

36.     Brian Nichols ("Nichols") was a paid writer for Lidingo from February 2012 through at least March 2014. Nichols wrote paid articles, which Lidingo published under its own pseudonyms, including The Swiss Trader.

37.     Thomas Meyer ("Meyer") was a paid writer for Lidingo as well as several other stock promotion firms, including DreamTeam, CSIR Group, LLC, and Dunedin, Inc. He published at least two articles about Lion, one under his own name and, at least one other article under the pseudonym John Rivers. On June 11, 2017, Meyer consented to a permanent injunction prohibiting him from violating Sections 17(a) and 17(b) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and requiring him to pay disgorgement of ill-gotten gains.

## IV.     VIOLATIONS OF THE EXCHANGE ACT

38.     Throughout the Class Period, Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged in Section IV.B, *infra*, were

materially false and misleading; (ii) such statements would adversely affect the integrity of the market for Lion securities; and (iii) such statements would deceive investors into purchasing Lion securities at artificially inflated prices. The Defendants also either knew, or were reckless in not knowing, that investors visited investment websites like *Seeking Alpha* and *Wall St. Cheat Sheet* to make their investment decisions about Lion.

### A.   <u>Substantive Allegations</u>

#### 1.   Creation of the Stock Promotion Scheme

39.   Singh and Bjorlin began their stock promotion scheme prior to the beginning of the Class Period. In July 2011, Singh founded Lavos—a stock promotion company that provided promotional services to issuer clients. Singh organized Lavos with his wife, Maria Singh, as the managing member and sole principal. However, Ms. Singh did not have an operational role in the company, and she did not use her married name on any company documents. Rather, she was referred to as Maria Santos, thus disguising her connection to the only true employee and operational member of Lavos, her husband Manish Singh.[5]

40.   One month after founding Lavos, Singh began working with Bjorlin to assist her in organizing another stock promotion firm, Lidingo, to work with him on promotional projects for public companies. Bjorlin was the only managing member of Lidingo, and the only signatory to its bank accounts.

41.   From September 2011 through March 2014, Lavos and Lidingo worked together to provide stock promotion services to publicly-traded companies. As part of the scheme, the issuers paid Lidingo or Lavos for the promotions, and in turn, Lidingo paid writers to write articles about the issuers that were published on investment websites like *Seeking Alpha.* From 2011 through 2014, Singh and Bjorlin paid at least fourteen writers to author over 400 internet publications on investment websites.

---

[5]   *See, e.g.*, Exhibit 10.14 to Form S-1/A Amendment No. 3 filed by Advanced Medical Isotope Corporation on November 28, 2012 (consulting agreement between Advanced Medical Isotope Corporation and Lavos)

42.     Under the arrangement between Singh and Bjorlin, Singh would find issuer clients for Lavos and Lidingo, including the companies at which he served as CEO. Bjorlin would, in turn, perform the day-to-day promotional work, including working with writers and coordinating the publication of articles about the issuer-clients. Singh would provide ideas for the articles, edit the articles, and at times, direct which writer should draft an article and when and where it should be published.

43.     Singh also participated in other aspects of Lidingo's promotional work, including coaching Bjorlin on business development and providing her with instructions for calls with new clients. Additionally, Singh reviewed and commented on Lidingo expense reports that included details about payments to writers for Lidingo articles.

44.     Under the arrangement between Lidingo and Lavos, Lidingo was responsible for paying writers for publishing articles for both Lavos and Lidingo.[6] Accordingly, Lavos would send a portion of its profits from the promotional scheme to Lidingo. Pursuant to their contracts, Singh and Lavos had a right to receive at least $1.75 million in cash and equity from their promotional activities.

45.     Bjorlin's ghost-writers would use a variety of aliases and would post articles on third party websites—predominantly *Seeking Alpha*. The ghost writers claimed to be established, credible investment professionals. These included, among many, the Swiss Trader—purportedly an avid stock trader with a degree in Physics and an MBA in Finance, and "Amy Baldwin"— purportedly a current employee of a Fortune 20 company. The claims made in these profiles were false because the profiles were, in fact, aliases used by Lidingo to promote its clients, and the persons who used the accounts were Lidingo employees and/or contractors. From 2011 to 2014, Lidingo published at least 400 articles, by fourteen different writers, under at least ten different aliases.

---

[6]     Similar conduct occurred for Galena and CytRX as part of the ongoing scheme. *See* "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions" written by Feuerstein, published on *TheStreet* on February 12, 2014; *see also* "Behind the Scenes with Dream Team, CytRx, and Galena," written by Pearson, published on *Seeking Alpha* on March 13, 2014.

46.     Singh directed the promotional scheme by instructing Lidingo not to use writers who disclosed compensation. For example, in October 2011, a writer hired by Lidingo disclosed in an article for *Seeking Alpha* that he had been paid. Referencing that writer in an email to Singh in April 2012, Bjorlin stated, "the idiot we used in the beginning, he will NOT post a disclosure again . . . ."[7]

47.     Following the incident in October 2011, Bjorlin repeatedly emailed Singh about potential writers and flagged those who disclosed compensation. With respect to one writer in April 2012, Bjorlin noted, "[H]e wants to disclose . . . no disclosures allowed." Singh responded by confirming the writer was a "no." In a January 2013 email, Bjorlin sent Singh a chart of potential writers, including one who "wants to disclose on *Seeking Alpha*." Singh informed Bjorlin not to use that writer. Similarly in April 2013, Singh said about another writer that he was "no good because he 'advertises' he has a website that pays for writing."

48.     Singh also directed Bjorlin to tell writers not to disclose compensation. In an email sent on February 20, 2012, Singh told Bjorlin to tell a writer, "there would be no disclosures associated with any article." In May 2012, Singh recommended that Bjorlin tell a writer not to disclose compensation on his personal website because "[t]his would create a red flag for investors who would want to dent his credibility." In an April 2013 email, Singh stated to Bjorlin about a potential writer, "[j]ust make sure he understands NO disclosure."

49.     Bjorlin also instructed writers not to disclose their compensation. On December 8, 2011, Bjorlin told a writer, "you will not be able to disclose that you are being paid to write." On April 3, 2012, she told another writer, "[w]e unfortunately cannot have the disclosure on there." In August 2012, Bjorlin told that same writer, "[a]gain, we can't have any disclosures." On February 11, 2013, Bjorlin sent writer the "requirements that needed to be followed to continue writing for Lidingo," which included, "[n]o disclosure of compensation."

---

[7]     Unless otherwise noted, all references to emails sent by Bjorlin and Singh, were derived from *Securities and Exchange Commission v. Lidingo Holdings, LLC, et al,* 1:17-cv-02540 (S.D.N.Y. Apr. 10, 2017).

50.     At the direction of both Singh and Bjorlin, none of the over 400 promotional articles published by Lidingo and Lavos disclosed compensation from the public company clients, and at least 200 of the articles published on *Seeking Alpha* affirmatively misrepresented that the author did not receive compensation.

### 2.     Singh Uses the Scheme for His Own Company - IMUC

51.     From February 2008 through August 2012, Singh was the CEO of a publicly traded company, IMUC. In September 2011, while he was IMUC's CEO, Singh hired Lidingo (becoming one of its first clients) to perform promotional work for IMUC.

52.     The Lidingo-IMUC contract required IMUC to pay Lidingo $5,000 a month. Lidingo, in turn, paid writers to publish articles describing IMUC securities on investment websites like *Seeking Alpha* and *Benzinga*. In addition, Lidingo paid writers to ghost-write articles about IMUC, which Lidingo then published under pseudonyms. None of the over 50 articles disclosed the writers' or Lidingo's compensation from IMUC.

53.     Throughout the period in which Lidingo provided services for IMUC, Singh had ultimate approval authority for all IMUC articles, and took part in providing content for the articles as well as editing the articles. For example, on July 17, 2012, Lidingo published an article discussing IMUC on *Seeking Alpha* under a pseudonym. Singh provided edits to the article, which were incorporated into the published version.

54.     Further, on March 21, 2012, Singh instructed Lidingo to write two articles on IMUC, and he chose the writers for those articles. Singh also chose the topics to be discussed in both articles. Neither writer disclosed his receipt of compensation from IMUC or otherwise suggested that the articles were part of a paid promotion.

55.     Additionally, on February 8, 2012, Singh reviewed a Lidingo writer's idea for an article on IMUC and noted that the article would, "move these stocks."

56.     On August 14, 2012, Singh resigned from IMUC.

### 3.      Galena Becomes an Early Customer of Lidingo

57.      From no later than January 2012 through March 2014, Lidingo provided stock promotion services to Galena under agreements by which Lidingo received cash payments and equity from Galena in exchange for stock promotion services.

58.      As part of these agreements, Lidingo arranged for at least 90 articles to be written and published about Galena stock. The articles were written by at least seven writers paid by Lidingo, many under pseudonyms. None of the articles were accompanied by a disclosure indicating the writer had been compensated or the amount of compensation.

59.      Throughout the period in which Lidingo provided services for Galena, Singh had approval authority for Galena articles, and took part in providing content for the articles as well as editing the articles. For example, in February 2012, Lidingo published an article discussing Galena on *Seeking Alpha*. Singh provided edits to the article, which were incorporated into the published version.

60.      Further, Bjorlin communicated with Galena's CEO regarding stock price goals, and the two worked together to craft articles which increased Galena's stock price to specific targets.[8]

61.      Over the time that Lidingo worked for Galena, Galena's stock price increased over 900%.

### 4.      Singh Joins Lion

62.      On July 24, 2013, Lion's predecessor company, Genesis Biopharma, Inc. ("Genesis"), entered into an Agreement and Plan of Merger with Lion, which was then a non-operating entity with no assets and no liabilities. Lion's only account balances were shares held by two owners, one of whom was Singh.[9] Pursuant to the terms of the merger, all outstanding shares of Lion common stock were cancelled and converted into the right to receive shares of the Genesis's common stock. [10] Under the terms of the merger agreement, Genesis shareholders held

---

[8]      *See* Galena Report at 4 ("We found evidence that Lidingo paid bloggers to write promotional articles about . . . [Galena] and . . . [Galena] was aware of this fact.").

[9]      *See* Exhibit 10 to Form 8-K filed on July 25, 2013 (Agreement and Plan of Merger).

[10]      *Id.*

---

83.6% of the combined company and Lion shareholders (primarily Singh) initially received 8.2%, but had the right to receive up to 16.4% of the combined company based on achievement of certain milestones.[11] The Company, while renamed Lion, initially traded under the stock symbol GNBP. In connection with the Merger, Singh was appointed as the Company's CEO and joined the Board as Chairman.[12]

63.     The merger agreement also provided that during the 12-month period following the Merger, for each $1,000,000 of gross proceeds received by Genesis from any financings, licensing or similar transaction (except from certain listed investors), Singh would receive additional shares of common stock.[13] Singh also was entitled to additional shares of common stock if, during the 18 months following the closing of the merger, the closing price per share of the common stock equaled or exceeded $0.04, as adjusted for any stock split, reverse stock split, recapitalization or the like, and $100,000 of the common stock is traded for any 10 out of 30 consecutive trading days.[14]

64.     Singh's employment agreement detailed that Singh's annual base salary was $34,000 until the Company raised at least $1,000,000 in additional financing, after which his salary would automatically increase to $350,000.[15]

65.     Shortly after Singh took over, in September 2013, Lion enacted a 1-for-100 reverse stock split that reduced its outstanding common shares from 1.5 billion to 15 million. The Company also formally changed its name from Genesis Biopharma to Lion Biotechnologies, trading under the symbol LBIO.

---

[11]     See Exhibit 99.1 to Form 8-K filed on July 25, 2013.

[12]     *See* Exhibit 10 to Form 8-K filed on July 25, 2013 (Agreement and Plan of Merger).

[13]     *Id.*

[14]     *Id.* at 3.

[15]     *See* Executive Employment Agreement filed on July 25, 2013.

5.     **Singh Immediately Incorporates Lion into the Stock Promotion Scheme in Order to Achieve the Lucrative Milestones in His Employment Contract**

66.     Singh, just as he had with IMUC, immediately immersed Lion in his stock promotion scheme by retaining Lidingo in September 2013. Singh had a massive incentive to boost Lion's stock price and trading volume as well as raise capital—regardless of its actual financial performance. He recognized that a startup like Lion could see its stock market performance enhanced by the appearance of apparently neutral, third party articles touting Lion and its drug development efforts. Accordingly, in September 2013, Lion entered into consulting agreement with Lidingo signed by Singh and Bjorlin. This contract with Lidingo required Lion to pay $240,000 for 12 months of service at a rate of $20,000 per month and issue 50,000 shares of Lion stock to Lidingo.[16] This was part of Lidingo's standard compensation, as it received monthly payments and securities from at least two other companies for its stock promotion services.[17] Indeed, the equity stakes Lidingo received from these arrangements were an essential element of how Lidingo generated income.[18] Lidingo also used these funds to cover the expense of paying authors to write favorable articles about Lion.[19] Bjorlin also invested an additional $100,000 in Lion in a November 2013, private placement.[20] Lion paid Lidingo more than $230,000 in the six month period from the end of September 2013 through March 2014, before cancelling the agreement in April 2014. This payment was nearly double the $20,000 monthly payment actually required under the contract.

---

[16]     *See* Consulting Agreement between Lion and Lidingo at ¶ 2; Lion's Form S-1 Registration Statement filed on December 4, 2013 at 61. In 2012, Lidingo similarly contracted with Galena to receive $20,000 per month for twelve months for Lidingo's services. *See* Galena Report at 23.

[17]     *See* Galena Report at 25-26 and Exhibit 37 (consulting agreement between Galena and Lidingo dated August 1, 2013 attached thereto; Exhibit 10.15 to Form S-1/A Amendment No. 3 filed Advanced Medical Isotope Corporation on November 28, 2012 (consulting agreement between Advanced Medical Isotope Corporation and Lidingo).

[18]     *See* Galena Report at 26 ("Lidingo represented to Mr. Ahn that equity stakes are how Lidingo generates its income.").

[19]     *See* Consulting Agreement between Lion and Lidingo at ¶ 3 ("All expense for this consulting work will be paid for by the Consultant and are included in the payments received under Section 2.").

[20]     *See* Lion's Form S-1 Registration Statement filed on December 4, 2013 at 54, 61.

67.     In exchange for cash and stock, Lidingo paid writers to publish bullish articles and blog entries about Lion on investment websites *Seeking Alpha* and *WallStCheatSheet.com*.[21] Some of these articles were ghost-written by Lidingo and published under pseudonyms, and none of the articles disclosed the writers' or Lidingo's compensation from Lion or otherwise disclosed that the articles were part of a paid promotion. In fact, each of the *Seeking Alpha* articles affirmatively misrepresented that the author had not been compensated. The articles are described in detail in Section IV.B.1, *infra*.

68.     Singh, acting as Lion's CEO, contributed to the Lidingo articles, reviewed and edited them, and controlled the timing of their publication.[22] For example, on September 13, 2013, Singh sent Bjorlin an email attaching a proposed article discussing Lion and directing Lidingo to have the article published by a specific Lidingo writer or under the Lidingo pseudonym "The Swiss Trader." Two weeks later, Lidingo published a nearly verbatim version of Singh's article on *Seeking Alpha* under the pseudonym The Swiss Trader, entitled, "3 Companies Developing the Future of Cancer Therapy." At Lidingo's direction, the author affirmatively misrepresented that he had not been compensated.

69.     In a separate instance, on December 31, 2013, Singh responded to a draft article about Lion, stating, "This is okay to publish. I think I need to talk to [the writer] to explain how these technologies really work." On the same day, Singh instructed Bjorlin to have the writer publish the article on the following Thursday.

70.     Further, on January 20, 2014, Singh sent Lidingo an idea for an article on Lion securities, which resulted in the publication of the article, "Immune Checkpoint Blocker Race Heats Up" on February 18, 2014 on *WallStCheatSheet.com*. The article did not disclose that the author had been compensated.

---

[21]     *See* Consulting Agreement between Lion and Lidingo at Exhibit A (listing consulting services, which included "creat[ing] awareness of Company [Lion] on Wall Street and in U.S. health care institutional investment community through email and other distribution mechanisms").

[22]     *See* Consulting Agreement between Lion and Lidingo at ¶ 1 ("DUTIES . . . . Consultant [Lidingo] will utilize only materials, reports, financial information or other documentation that is approved in writing in advance by the Company.")

71.     All told, the Defendants had at least fourteen promotional "news" stories published touting Lion between September 2013 and March 2014. *See infra* § IV.B.1. None of the articles disclosed the writers' or Lidingo's compensation from Lion or otherwise disclosed that the articles were part of a paid promotion.

72.     Additionally, between July 2013 and March 2014, Lidingo hired a vendor to coordinate the distribution of over 500,000 emails describing public company securities, including Lion, to a list of potential investors. Lidingo did not disclose in the emails that it had been directly compensated by the issuers. Singh approved the expense of having Lidingo work with a vendor to send Lion-related mass emails.

### 6.     The Scheme Unravels

73.     The scheme began to unravel in early 2014, when Feuerstein and Pearson exposed stock promotion schemes at Galena and CytRx. These articles set in motion a series of investigations and litigation that exposed Lidingo's role in over a dozen promotional schemes, including Lion's.

74.     On February 12, 2014, Feuerstein, published an article titled "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions" on *TheStreet*. Feuerstein reported that *Seeking Alpha* had recently removed two articles touting Galena because they were written by the same person using different aliases.

75.     In the article, Feuerstein further explained:

> The most recent incident is more serious and potentially damaging because of evidence linking Galena to a stock-promotions firm which wrote and published the articles on *Seeking Alpha*. The articles were part of a broader, coordinated "brand awareness campaign" designed to boost Galena's stock price, according to a document obtained by *TheStreet*.

76.     Moreover, he suggested that the promotional campaign may have tripled the value of Galena's shares, stating that: "[a]ided by this promotional campaign, Galena shares tripled in value from this summer. Coincidence or not, Galena insiders have made millions of dollars by selling company stock in January."

77.     Feuerstein was unable to link Lidingo to Galena at the time, but he did link Galena's promotional campaign to another stock promotion firm, DreamTeam, stating that:

> As part of this campaign, DreamTeam published favorable articles about Galena on *Seeking Alpha* on Aug. 7, 2013 and Nov. 22, 2013, according to the case-study document. But the articles were written under aliases and make no mention of DreamTeam or its paid marketing relationship with Galena. Instead, they're written from the perspective of individual investors recommending an investment in Galena to other readers of *Seeking Alpha.*

78.     In an immediate response to the Feuerstein article, the SEC opened an investigation into Galena and its use of stock promotion companies. In a Form 10-K filed on March 17, 2014, Galena disclosed that "[i]n February 2014, we learned that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013."[23]

79.     Further revelations occurred on March 13, 2014, when Pearson, an investor in small cap and other stocks, published an article on *Seeking Alpha* titled "Behind the Scenes with Dream Team, CytRx, and Galena." According to Pearson, DreamTeam, a stock promotion firm, had asked him to write paid promotional articles regarding Galena and CytRx without disclosing payment. Pearson provided detailed documentation, including e-mails and attachments that indicated that management from both Galena and CytRx reviewed and edited the paid articles at the same time those executives were looking to sell or issue shares. In recounting initial emails from DreamTeam, Pearson stated, "I was offered $300 per article, but was also told that there were two conditions. First, management of the companies would have to sign off (and edit) the articles. Second, I would not be allowed to disclose that I was getting paid."

80.     Additionally, Pearson was also "told not worry about posting on Yahoo message boards, because DTG [DreamTeam] has a full team which handles the posting of numerous bullish messages on places like Yahoo Finance."

81.     With regard to CytRx, he stated, "I was able to receive fully edited copies of the dummy articles which bore the electronic signature of the VP of Business Development (David Haen) as well as by the Assistant to the CEO (Lauren Terrado). The conclusion I reached is obvious: management at CytRx was intimately involved in editing these documents extensively."

---

[23]     Form 10-K filed by Galena on March 17, 2014.

82.    Pearson also stated, "CytRx management was well aware that these articles are being published. They also knew that these have been articles via Dream Team / Mission IR. They were also actively participating in the editing of the articles. Management also should have been well aware that no disclosure was being made about the fact the CytRx management was paying Dream Team and the writers for these articles, or about the editing of them."

83.    Accompanying the article was a note from Pearson stating that "[a]t least 13 recent articles covering CytRx have been removed from circulation at Seeking Alpha, Wall Street Cheat Sheet, Motley Fool and Forbes. Many were removed in just the past two days." The editors at *Seeking Alpha* also accompanied the article with a statement that "[u]pon reviewing Mr. Pearson's article, we removed articles from *Seeking Alpha* that were in violation of our policies. We take author integrity very seriously and appreciate Richard's work in helping us identify authors who were in breach of our contributor Terms of Use."

84.    Then, on March 27, 2014, *Seeking Alpha* published an editorial apologizing to its readers entitled, "What Seeking Alpha Is Doing to Prevent Paid Stock Promotion." Eli Hoffmann, *Seeking Alpha's* editor-in-chief explained:

> Recently, our editors were forced to remove a number of articles from Seeking Alpha after we discovered that their authors had been compensated by stock promoters to publish positive articles on specific stocks. In their disclosures, the authors lied—explicitly stating that they were not receiving third-party payment for their articles. To be clear: Seeking Alpha does not allow paid stock promoters or IR firms to submit articles about stocks to which they have a relationship.

85.    On May 14, 2014, it became apparent to industry insiders that the SEC was looking beyond Galena when Lion disclosed in its Form 10-Q for the first quarter of 2014 that it had received a subpoena on April 23, 2014 from the SEC, stating in pertinent part:

> On April 23, 2014, the Company received a subpoena from the Securities [and] Exchange Commission (the "SEC") that stated that the staff of the SEC is conducting an investigation *In the Matter of Galena Biopharma, Inc. File No. HO 12356* and that the subpoena was issued to the Company as part of the foregoing investigation. Galena Biopharma is an unaffiliated, publicly-held biopharmaceutical company. In the Form 10-K that Galena Biopharma, Inc. filed with the SEC on March 17, 2014, Galena Biopharma stated that the SEC is investigating certain matters relating to Galena Biopharma and an outside investor-relations firm that it retained in 2013. The SEC's subpoena and accompanying letter do not indicate whether the Company is, or is not, under investigation. The Company has contacted the

SEC's staff regarding the subpoena, and the Company is cooperating with the SEC.

The subpoena requires the Company to give the SEC, among other materials, all communications between anyone at the Company and certain persons and entities (which include investor-relations firms and persons associated with the investor-relations firms), all documents related to the listed persons and entities, all articles regarding the Company posted on certain equity research or other financial websites, and documents and communications related to individuals who post or have posted articles regarding the Company on equity research or other financial websites.

86.     Based upon Lion's disclosure, author Feuerstein wrote an article on May 14, 2014, reporting the Lion filing and suggesting the existence of a widespread SEC investigation into stock promotion and small biopharma companies. He noted links between Lion and other users of stock promoters, including Singh's action at IMUC and the fact that Lion shared a board member with Galena—Galena's Chairman Sanford Hillsberg.[24]

87.     As a result of the Feuerstein and Pearson articles, the Galena Board of Directors formed a Special Committee charged with determining the merits of the articles and resulting complaints. On July 15, 2014, the Special Committee issued the Galena Report (made public in September 2014) based on interviews and over 140,000 pages of documents. Significantly, the Special Committee for the first time publicly implicated Lidingo as an entity involved in illegal stock promotion activities and specifically disclosed in detail Lidingo's improper conduct in paying bloggers for promotional articles about Galena. In particular, the Special Committee made the following findings of fact:

- "evidence that Lidingo paid bloggers to write promotional articles about [Galena] and that [Galena] was aware of this fact;" and

- "evidence that Lidingo intended and claimed to have raised the Company's stock price through its efforts;" and

- The possibility that "Lidingo violated Section 17(b) of the Securities Act of 1933."[25]

88.     As part of the Special Committee's findings, they disclosed numerous emails and contracts between Lidingo and Galena, including:

---

[24]     "SEC Casting Wide Net in Galena Investigation," A. Feuerstein, *theStreet*, May 14, 2014, https://www.thestreet.com/story/12709211/1/sec-casting-wide-net-in-galena-investigation.html.

[25]     *See* Galena Report at 4-5.

- A Consulting Agreement between Galena and Lidingo dated January 4, 2012;[26]

- A Consulting Agreement between Galena and Lidingo dated July 30, 2013;[27]

- An email from Bjorlin to Galena's CEO dated April 5, 2012, [28] noting the impact of paid promotional articles (undisclosed as such) in boosting Galena's share price:

    Dear Mark,

    As a continuation of last nights [sic] email, I would like to respectfully add another request.

    As you may already know, in the first quarter GALE was the second best performing biotech stock on NASDAQ after THLD due to our very successful campaign. We have put a lot of resources and energy, primarily because this is a great story REDACTED we didn[']t ask for cash plus options deal at that point since we hadn[']t established credibility with you on our capabilities and wanted to make sure we can deliver value to you. As you know our upside from cash is very limited due to expensive nature of this campaign. I also think the round 2 would be much harder as this financing at significant discount to 10 day moving average has burnt a lot of investors who came in the last month.

    I would like to humbly propose to consider stock options as additional compensation for both as a reward for past successes and as a future incentive. My request is for 400K stock options (200K vested now and 200K spread over next two quarters). Please consider and let me know. This is a small cost to GALE and would ensure we are appropriately compensated for the hard work and the risks, as well as performance.

    Thank you,

    Milla

- An email from Bjorlin to Galena employee Madelina Hatton dated April 7, 2012 indicating that a check to Lidingo from Galena was to be signed. Hatton confirmed with another Galena employee that the check would be signed by Galena's CEO;[29]

- An email from Bjorlin to Galena's CEO dated November 12, 2012 promising, "I can make a guarantee if stock isn't up at least 25% by year end. I will refund the money to you;"[30] and

---

[26]   *See* Galena Report Ex. 36.

[27]   *See* Galena Report Ex. 37.

[28]   *See* Galena Report Ex. 58.

[29]   *See* Galena Report Ex. 59.

[30]   *See* Galena Report Ex. 62.

- An email from Bjorlin to Galena's CEO dated April 9, 2013, stating, "We have already set up huge email campaigns and assigned writers to promote the company . . . . Our work and efforts have continued boosting volume and price appreciation into this week, as you can see."[31]

89. Just months after Lion disclosed its receipt of an SEC subpoena, and Galena's board publicly disclosed that Lidingo was engaged in illegal stock promotion activities, on November 12, 2014, during aftermarket hours, Lion issued a press release entitled "Lion Biotechnologies Announces Management Change," announcing the resignation of Defendant Singh, ostensibly for "personal reasons."

90. Two days later, on November 14, 2014, Pearson published an article entitled "More Fallout From Stock Promotion Scandal" on *Seeking Alpha*. The article tied the Galena stock promotion scheme to Lidingo and Lion, and suggested that Singh was fired for his role in the scandal, stating:

> As it turns out, the fallout is not yet done. It looks like there are additional companies, including those above, which are being impacted. The most obvious one is Lion Biotechnologies (OTCQB:LBIO), which disclosed that it had been subpoenaed in April in connection with the SEC's investigation of Galena.
>
> Following an internal investigation at Galena, CEO Mark Ahn "resigned" for personal reasons. More recently, Lion Bio's CEO Manish Singh just announced that he is also resigning for "personal reasons." As we will see below, it may be more complicated than this.
>
> Our first clue comes from the report from the special committee investigating the Galena paid promotion scandal. Within that report, it is noted that:
>
> "During our investigation, we discovered that another of the Company's investor relations firms, Lidingo . . . , might have engaged in improper conduct relative to the payment of bloggers for promotional articles written about the Company. As a result, the scope of our investigation expanded to include an analysis of whether the Company's retention and management of Lidingo violated any law or Company policy. In connection with that analysis, we have made the following findings of fact:
>
> (9) We found evidence that Lidingo paid bloggers to write promotional articles about the Company and that the Company was aware of this fact;
>
> (10) We found evidence that Lidingo intended and claimed to have raised the Company's stock price through its efforts;

---

[31]   *See* Galena Report Ex. 66.

(11) We found that Mark Ahn granted stock options to Lidingo as part of its compensation for its services without Board approval, which is contrary to Company policy;"

The conclusion from this is that the Dream Team was not alone in its stock promoting activities. There were other firms (such as Lidingo) engaged in the same behavior.

91.     Pearson also uncovered for the first time the connection between Lion and Lidingo—Manish Singh and his own stock promotion company, Lavos. As described in Section IV.A, *supra,* Singh founded Lavos in July 2011 with his wife, Maria Singh, also known as Maria Santos. Just two months later, Singh worked with Bjorlin to form Lidingo, and from September 2011 through March 2014, Lavos and Lidingo worked together on the stock promotion scheme. Singh's connection to Lidingo had been generally unknown until Pearson revealed the details of his relationship to Lavos, and Lavos' relationship with Lidingo, stating:

It should be noted that the compensation awarded to Lavos (AKA Maria Santos) and the description of the duties involved is identical to those laid out in the similar ADMD contract for Lidingo.

Lest there be any doubt about the similarity between the two, the last page of the Lavos contract actually has a typo on it, which should remove all doubt. In the signature page, Advanced Medical Isotope forgot to change the signatory name and instead left in "Kamillia Bjorlin" of Lidingo. From the first page, we can see that this contract was made out for Lavos. The point of this is that both companies are serving the identical function.

Why does all of this matter?

As it turns out, Ms. "Santos" is in fact Mrs. Maria Singh, the wife of Lion Bio just-resigned CEO who resigned for "personal reasons." This can be found out by looking at the information on file for Lavos with the Nevada Secretary of State. It clearly shows Maria S. Singh as the managing member. Mr. Singh and Mrs. Singh can also be shown to be related on Intelius.[32]

92.     Finally, on April 10, 2017, the SEC issued a press release stating that it had "announced enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes that left investors with the impression they were reading independent, unbiased analyses on investing websites while writers were being secretly compensated for touting company stocks."

---

[32]     *See* https://www.intelius.com/people/Manish-Singh/Calabasas-CA/0C13CYZ6X0P

93.     On the same day, the SEC published cease and desist orders in connection with administrative proceedings against Lion, Singh, and Lavos for violations of the securities laws. In the Order Instituting Cease-and-Desist Proceedings against Lion, the SEC revealed that:

> From September 2013 to March 2014, Lion, through its former Chief Executive Officer, Manish Singh, engaged in a scheme to mislead investors by commissioning over 10 internet publications and 20 widely distributed emails promoting Lion to potential investors that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish articles about Lion on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. Singh actively participated in Lidingo's promotional work for Lion and understood that Lidingo was using writers who would not disclose that Lion was indirectly compensating them for their publications. These omissions, and in some cases, affirmative misstatements by writers that they were not receiving compensation for their articles, created the misleading impression that the views contained in the publications were objective and independently formed.

94.     In the Order Instituting Cease-and-Desist Proceedings against Singh, the SEC further revealed that:

> From August 2011 to March 2014, Singh engaged in a paid stock-touting scheme involving 12 issuers, at least 10 writers, over 400 internet publications, and the distribution of emails to thousands of potential investors. At different points during this time period, Singh, who used his firm Lavos to engage in much of the stock promotion activity, was also the CEO of two publicly traded companies, ImmunoCellular Therapeutics, Ltd. ("IMUC") and Lion Biotechnologies, Inc. Singh worked with stock promotion firm Lidingo Holdings, LLC to pay writers to publish articles about public company clients on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. In addition, while he was their CEO, Singh hired Lidingo to perform promotional work for IMUC and Lion. The scheme was lucrative—entitling Singh to receive at least $1.75 million in cash and equity. Singh knew or was reckless in not knowing that none of the over 400 publications appropriately disclosed the receipt of compensation and that at least 200 of the articles affirmatively misrepresented that the author was not receiving compensation. These omissions and affirmative misstatements created the misleading impression that the views contained in the publications were objective and independently formed.

**B.**     **Defendants' Materially False and Misleading Statements and Omissions**

    **1.**     **The Promotional Articles Were Materially False and Misleading When Published Because They Affirmatively Misstated and/or Omitted Material Facts**

95.     The Defendants had at least fourteen promotional "news" stories published touting Lion during the Class Period. The articles were reviewed, edited and approved by Defendant Singh prior to their dissemination to the investing public, including the following:

- "3 Companies Developing the Future of Cancer Therapy" (Sept. 27, 2013) *Seeking Alpha* by The Swiss Trader;

- "Investing Smart: Biotechs, Effective Therapies and Shareholder-Friendly CEOS" (Oct. 2, 2013) *Seeking Alpha* by Brian Nichols;

- "5 Companies Race to Develop the Next Great Melanoma Product" (Oct. 18, 2013) *Seeking Alpha* by The Swiss Trader;

- "Singh Secures Lion for 2 Years & Prepares for Uplisting" (Oct. 31, 2013) *Seeking Alpha Instablog Sub-Site* by Brian Nichols;

- "Combination Therapies Hold Key to Future Cancer Treatments" (Nov. 12, 2013) *Seeking Alpha* by Brian Nichols;

- "Lion Biotechnologies: 3 Bullish Reasons Why I Like This Speculative Biotech" (Nov. 25, 2013) *Seeking Alpha* by Brian Nichols;

- "2 Biotech Stocks Facing Major Catalysts in 2014" (Dec. 2, 2013) *WallStCheatSheet.com* by Tom Meyer;

- "4 Companies Developing Blockbuster Immunotherapies to Fight Cancer" (Dec. 9, 2013) *Seeking Alpha* by Glen S. Woods;

- "4 Stocks in 4 Industries That Could Make Significant Gains in 2014" (Dec. 23, 2013) *Seeking Alpha* by Brian Nichols;

- "Are Modified T-Cells a Game Changer in Treating Cancer*?*" (Jan. 15, 2014) *Seeking Alpha* by The Swiss Trader;

- "Combination Therapies: Where Immuno-Oncology Is Headed and How To Invest" (Feb. 6, 2014) *Seeking Alpha* by Brian Nichols;

- "2 Young 'Cats' of Biotech Poised to Climb Higher in 2014" (Feb. 10, 2014) *Seeking Alpha* by Glen S. Woods;

- "Immune Checkpoint Blocker Race Heats Up" (Feb. 18, 2014) *theCheatSheet.com* by John Rivers; and

- "Modified T-Cells: Quietly Becoming Very Relevant" (Mar. 1, 2014) *Seeking Alpha* by Brian Nichols.

96.     The foregoing articles were each materially false and misleading, and were known by Defendants to be misleading at the time they were disseminated to the market because they either affirmatively misstated that the writers were not paid for the articles and/or failed to disclose that: (i) Lion had paid Lidingo to tout Lion's current performance and future prospects, often using aliases; and (ii) Defendant Singh directly reviewed, edited and approved some or all of the articles prior to their publication. As a result of the foregoing, the promotional articles were materially misleading at all relevant times.

97.     In addition to misleading investors by omitting the material facts referenced above, many of the promotional articles referenced in ¶ 95, *infra*, also made **affirmatively** materially false and misleading Class Period statements about Lion and its prospects.

### a.   The September 27, 2013 Promotional Article

98.     On September 13, 2013, Singh sent Lidingo an email attaching a proposed article discussing Lion and directing that Lidingo have the article published either by a specific Lidingo writer or under the name The Swiss Trader, a pseudonym commonly used by Lidingo writer Nichols.

99.     Two weeks later, on September 27, 2013, Lidingo published an article titled "3 Companies Developing the Future of Cancer Therapy" on *Seeking Alpha* using the pseudonym The Swiss Trader. The article was a nearly verbatim version of Singh's attached article. The article touted Lion's technology, noting that "[t]umor infiltrating lymphocytes (TILs) . . . can completely eliminate all cancer in as many as 12% of metastatic melanoma patients," while a competitive technology could "only achieve a complete response rate of about 2%." The article further noted that "TILs . . . have a better objective response rate (ORR) compared to conventional therapies: 50% vs. 11% for Yervoy." Notably the article grouped Lion with Novartis and Celgene, two biotechnology giants.

100.    The article painted a bullish outlook for companies developing T cell technology, stating that:

> Now, every major drug company has an antibody product on the market, and antibodies generate over $40 billion in sales each year. It may take time, but cell-based manufacturing will eventually become like an

assembly line and ultimately profitable. And because of its market value and the upside in developing such products efficiently, both large and small companies continue to push forward in research—and as of late, have produced very strong clinical data.

\*     \*     \*

As T cell technology progresses, manufacturing will likely improve and become much more efficient. Investors should definitely keep an eye out on the leaders in this space, as their potential upside can generate nice returns.

101.    The opinions set forth in the article regarding the potential positive impact on the technology for Lion, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; (ii) Defendant Singh sent Lidingo an email attaching the proposed article and directed that Lidingo have the article published; (iii) Lidingo published a nearly verbatim version of Singh's proposed article; and (iv) Lidingo used a false alias to publish the story.

102.    The article contained the following disclosure:

I am long NVS, GNBP.OB. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

103.    The statements and other representations referenced in ¶¶ 99-100, 102, *supra*, regarding the lack of compensation received by the author for the article, were materially false and misleading when made because it failed to disclose that: (i) Lion had paid the author, through Lidingo,  to publish the article; (ii) Defendant Singh sent Lidingo an email attaching the proposed article and directed that Lidingo have the article published; (iii) Lidingo published a nearly verbatim version of Singh's proposed article; and (iv) Lidingo used a false alias to publish the story.

104.    As a result of the foregoing, "3 Companies Developing the Future of Cancer Therapy" was materially false and misleading at all relevant times.

105.    On September 27, 2013, the price of Lion's common stock opened at $4.55 and closed at $5.05. On September 30, 2013, the first trading day after the promotional article was published, the common stock closed at $6.55, a 43% increase from the opening price on September 27, 2013, before the promotional article was published.

### b.  The October 2, 2013 Promotional Article

106.    On October 2, 2013 at approximately 8:19 a.m. ET, Lidingo published an article titled "Investing Smart: Biotechs, Effective Therapies And Shareholder-Friendly CEOs" on *Seeking Alpha*, written by Nichols, a writer whom Lidingo paid. In the article, Nichols praised Singh's track record at IMUC and suggested that Singh's experience would likely create value for Lion's shareholders. In particular, Nichols wrote:

> One of my favorites is Dr. Manish Singh, formerly of ImmunoCellular. Singh has a strong scientific background with over 10 patents under his belt, he's someone I've spoken with a half dozen times, and he knows how to create shareholder value.
>
> *         *         *
>
> I have been anxious to hear of Dr. Singh's next venture. Because, after all, he did take IMUC from being a $5 million OTC stock to a near $200 million company prior to his departure (if you invested $25,000 in IMUC in January 2009 and sold in July 2012, that investment grew to more than half a million dollars!). . . .
>
> *         *         *
>
> Lion Biotechnologies currently trades at $6.50 a share with a market cap of $100 million. At first, I was highly skeptical of this company, and did not want to invest solely on the notion that Dr. Singh adds shareholder value. However, as I began to take a closer look, and really digest this company, I now believe it too might be something special.
>
> *         *         *
>
> There has been a resurgence of interest in T-cells in the last few years with very promising data showing potential cures in leukemia and significant interest from large companies such as Novartis (NVS) and Celgene (CELG) to develop this therapeutic modality. Dr. Singh is making his new bet on a new T-cell technology developed at National Cancer Institute.
>
> *         *         *
>
> [T]he data is robust, and it seems that Dr. Singh has once more struck gold.
>
> *         *         *
>
> While it is impossible to know whether or not TILs will be a success in Phase 3 trials, I think Dr. Singh has a good shot to replicate the success experienced at ImmunoCellular Therapeutics.
>
> *         *         *
>
> Like I said, management matters in biotechnology, and while having a CEO who concentrates on science is imperative, a company also needs someone with a "Wall Street edge" to add shareholder value. Dr. Singh,

who was a scientist before becoming a venture capitalist and CEO, is simply taking technology that was developed by world-renowned researcher/surgeon, Dr. Steven A. Rosenberg, who is one of the most cited researchers of our generation, and adding his twist of next generation technologies and rapid development to create shareholder value.

Looking at shares of ImmunoCellular both during and after his tenure, the performance speaks for itself. And as of now, with my initial analysis, I think Dr. Singh might just replicate that performance. Now, I am not suggesting that TILs will be a future success, but I do think it has a shot, and what we know now is encouraging. As an investor that seeks deep unknown value in biotechnology, and candidates that have products with big sales potential and the potential for success, I think Lion is interesting, and I am willing to take a small chance on the success of Singh and his new company.

107. The statements and other representations in ¶ 106, *supra,* regarding the author's purported opinions about Lion and Singh, his interest in the Company, and his contacts with Singh were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

108. In addition, the representations that **"*after all, he did take IMUC from being a $5 million OTC stock to a near $200 million company prior to his departure,*"** and Singh **"*adds shareholder value"*** were especially misleading given that Singh only was able to increase the value of IMUC by engaging in the same promotional scheme that he was now perpetrating with Lion.

109. The article contained the following disclosure:

I am long GALE, NBS, QCOR, JAZZ. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

110. The statements and other representations referenced in ¶ 109, *supra,* regarding the lack of compensation received by the author for the article, were materially false and misleading when made because it failed to disclose that Lion had paid the author, through Lidingo, to publish the article.

111. As a result of the foregoing, "Investing Smart: Biotechs, Effective Therapies and Shareholder-Friendly CEOs" was materially false and misleading at all relevant times.

112. On October 2, 2013, Lion's shares closed $2.50 higher than the previous day at $9.00, a 38.45% increase.

### c. The October 18, 2013 Promotional Article

113.     On October 10, 2013, Lion paid Lidingo $20,000. Eight days later, on October 18, 2013, Lidingo published the article "5 Companies Race to Develop the Next Great Melanoma Product" on *Seeking Alpha*, using the pseudonym The Swiss Trader. The article spoke glowingly about the Lion's upcoming trial and predicted that if the results were positive Lion's market capitalization would increase significantly. More specifically, the article stated:

> Lion Biotechnologies is developing tumor infiltrating lymphocytes (TILs) to treat metastatic melanoma. Results from early Phase I and II clinical trials showed unprecedented results: objective response rates as high as 72% with a median duration of response of about 14 months and a complete response rate of 22% when TILs were combined with total body irradiation. The most impressive thing about this trial was 19/93 patients treated continue to be disease free over 7 years, which would be considered a cure by any measure. There are currently two ongoing NCI-sponsored Phase II clinical trials (NCT01468818 and NCT01319565) to further evaluate the efficacy of TILs in treating metastatic melanoma. The company intends to initiate a Phase III registration trial in 2015. In addition, a number of combination trials using the company's technology are currently underway at major medical centers such as NCI, MD Anderson Center, and Moffitt Cancer Center. In 2014 trial data from the two sponsored trial[s] will be a major catalyst; if positive Lion will likely see its $100 million market cap appreciate in a large way.

114.     The statements and other representations in ¶ 113, *supra,* regarding the author's purported opinions about the effect of Lion's trial were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

115.     The article also contained the following disclosure:

> I am long AMGN, GILD. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.***

116.     The statements referenced in ¶ 115, *supra,* were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

117.     As a result of the foregoing, "5 Companies Race To Develop The Next Great Melanoma Product" was materially false and misleading at all relevant times.

#### d.  **The October 31, 2013 Promotional Article**

118.    On October 31, 2013, Nichols published an article titled "Singh Secures Lion For 2 Years & Prepares For Uplisting" on *Seeking Alpha's* Instablog, which are not selected, edited, or screened by *Seeking Alpha* editors. In the article, Nichols praised Lion for raising approximately $23 million in private financing and for following in the footsteps of Singh's prior company, IMUC.

119.    Nichols praised Singh's past record at IMUC, stating that:

> I believe it was November of 2011 when I first bought shares of ImmunoCellular Therapeutics (NYSEMKT:IMUC). Clearly, the data was good, and the investment has performed well, but there are always questions regarding the legitimacy of a small biotechnology company. I performed research, assessed the risk to reward, and over a period of time had several conversations with Dr. Manish Singh.

> Singh took IMUC from a small $5 million company to a $200 million company. Since his departure from IMUC, its stock has lost value. Hence, I have always admired his willingness to create shareholder value, so I bought shares in his new company Lion Biotechnologies (OTCQB:LBIO) at $5 a share.

120.    Nichols described the additional financing as a "game changer" and Singh's strategy as one that could create "long term shareholder value." In particular, he wrote:

> With that said, I am writing this instablog in response to what I believe is a game changer. My initial concern with Lion was that the company had no cash. Singh essentially had to start from scratch, and my belief was that he'd be lucky to raise $5-$10 million in his first financing attempt. But today (October 31) the company announced that it has entered into definitive agreements with institutional and other accredited investors to raise approximately $23 million in a private financing.

> So, why am I posting an instablog and making a big deal about this agreement. Honestly, it is not really worthy of a published article but I am impressed because of its size. With this deal, Singh shows that investors are willing to follow him into an investment.

> This financing completely transforms the company. It is being backed by strong life science funds and gives the company two years of cash, which is significant because previously they didn't have any cash. As a result, this strengthens the investment outlook, and gives investors a reason to be optimistic.

> *        *        *

> Lastly, I am impressed that Singh is following his previous pattern at IMUC. Lion is an OTC stock, but with this financing and its market cap near $100 million we can expect an uplisting to the NASDAQ just like

with IMUC under Singh's leadership. With all things considered, I think this financing could be an interesting discussion point. Personally, part of my value investing strategy revolves around management (i.e. XPO Logistics (NYSE:XPO) has been my largest position since Bradley Jacobs took over three years ago).

Therefore, I believe that Singh can make this company special with his operational strategy, and that this financing is the first step in creating long-term shareholder value.

121. The statements and other representations in ¶¶ 119-120, *supra,* regarding the Nichol's purported positive opinions about Lion and Singh, and his interest in the Company, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

122. In addition, the representation that "***Singh took IMUC from a small $5 million company to a $200 million company***" was especially misleading given that Singh only was able to increase the value of IMUC by engaging in the same promotional scheme that he was now perpetrating with Lion.

123. As a result of the foregoing, "Singh Secures Lion For 2 Years & Prepares For Uplisting" was materially false and misleading at all relevant times.

### e.   The November 12, 2013 Promotional Article

124. On November 12, 2013, Nichols published an article titled "Combination Therapies Hold Key To Future Cancer Treatments" on *Seeking Alpha*. The article portrayed Lion as an exciting investment opportunity, comparing Lion to three of the largest biotechnology companies in the industry, Merck, Bristol-Meyers, and Roche.

125. Nichols cited Singh's purported success with IMUC, stating, "One of the most notable small companies that is testing this approach might be Lion Biotechnologies (OTCQB:LBIO) helmed by Dr. Manish Singh. Singh was formerly the CEO of ImmunoCellular Therapeutics (IMUC) and made famous his multiple-antigen targeting approach at a time when immunotherapy was stealing the biotechnology spotlight."

126. Nichols also wrote:

At $3.55 Lion has a market cap of just $65 million. While there are risks associated with such a small company, Singh recently completed a private financing that gave the company net proceeds of $21.6 million. Thus

giving Lion more than two years worth of operating cash. Also, the company's data is robust, having treated 136 patients at four well respected sites. In fact, such data is far superior to what we've seen among competing companies in treating cancer, those that have higher market caps, including Singh's previous company ImmunoCellular Therapeutics with just 16 patients. While there are no guarantees that Singh's company can replicate its clinical data in an even larger study, investors have to like the combined effect of a larger number of strong T-cells and anti-PD-1s, both of which have shown consistent response rates in the 30%-50% range.

\*       \*       \*

Companies such as Merck, Bristol-Myers, Roche, AstraZeneca and then smaller companies such as Lion, have an opportunity to control a space that is much larger than anything being developed by the industry's elite. Thus, when I say a paradigm shift, we are not only seeing survival increase from months to years, but also in the way the market views companies developing such therapeutics. In the past, with very little progress and innovation being made, there was no reason to get too excited about new therapeutics. ***Today, there is real reason to be excited, and this could lead to a shift in which companies the market rewards with large valuation premiums, those such as Merck and possibly Lion at some point in the future***.

127.    One day after the article was posted, several comments appeared on the article. Nichols responded to the comments, again touting Singh as a ***"shareholder friendly CEO."***

128.    The statements and other representations in ¶¶ 124-127, *supra,* regarding the author's purported excitement about Lion and its "superior" patient data, and potential "large valuation premiums," and comments strongly favorable about Singh, were false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

129.    The article also contained the following disclosure:

I am long IMUC, MRK, OTCQB:LBIO. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

130.    The statements referenced in ¶ 129, *supra,* were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

131.    As a result of the foregoing, "Combination Therapies Hold Key To Future Cancer Treatments" was materially false and misleading at all relevant times.

#### f.   The November 25, 2013 Promotional Article

132.    On November 25, 2013, Nichols published an article titled "Lion Biotechnologies: 3 Bullish Reasons Why I Like This Speculative Biotech" on *Seeking Alpha*. In the article, Nichols advocated buying Lion common stock, stating: "***I'm bullish on a very small and new company called Lion Biotechnologies*** (OTCQB:LBIO), and there are three reasons in particular."

133.    First, Nichols justified his enthusiasm by pointing to the "robust data" suggesting that Lion's TIL technology may prove successful in larger scale studies. More specifically, Nichols wrote:

> Now, on paper nearly all biotechnology companies sound good, but as you look closer investors or biotech experts can usually find mishaps or problems with a technology. In the case of TILs, Lion is targeting the most aggressive form of melanoma in those patients who have not responded to other treatments. In this setting, TILs produced a 50% response rate including a 22% complete response. If this data holds, it would be the best data we've ever seen in fighting the disease.
>
> However, biotech investors must admit that many companies produce robust data in early stage testing, which then fizzles out in larger studies. Therefore, I was very skeptical when I first saw the data. But then I saw that TILs have already been tested on 136 patients at four different trials including MD Anderson and NCI. This means that Lion has robust data or a large patient population to draw conclusions from. In fact, 19 of the 20 patients who saw a complete response are still alive after 6 to 9 years. For this reason, I am bullish on the chances of TILs moving forward.

134.    Second, Nichols praised Singh's track record for creating "value for shareholders" by referring to Singh's success with IMUC. In particular, Nichols wrote:

> Like I said, Lion is a small company, one that I would have never noticed if not for news that Manish Singh was the CEO, after essentially taking over the board. Personally, I am a big believer of investing in management, and Singh has a history of creating value for shareholders in the clinical biotechnology setting.
>
> Singh was previously the CEO at ImmunoCellular Therapeutics (IMUC), where he took a $6 million OTC company and got it listed on the NASDAQ with a market cap of $200 million. Therefore, his involvement and merger to create Lion is what sparked my interest, but the data itself is what determined my investment. Moreover, with CEOs who are methodical in nature or have a history in financial markets, investors can almost predict future movements.
>
> Lion is very similar to ImmunoCellular Therapeutics in the initial years with Singh, although Lion has more robust data. At ImmunoCellular, one of Singh's goals was to uplist the stock from the OTC markets to the

NYSE, which he did in May 2012. As a result, shares of ImmunoCellular soared from $2.80 to $4.00, which then consequently led to its inclusion into the Russell Index Funds.

At Lion, I expect the same. The company already has a market cap of $80 million and has crossed the $100 million threshold several times in its short-lived existence. In company presentations, Singh has discussed upcoming milestones, which include his plans to list on the NASDAQ in Q1 of 2014. If so, this would be a major catalyst, also just before the Russell indexes rebalance. Thus, it could be a repeat of the performance we saw at ImmunoCellular.

135.    Third, Nichols recommended Lion because "in just a few months Singh has already secured $23.3 million in private financing" and therefore "Lion has enough cash to operate for the better part of two years, which is something that not many sub-$100 million biotechs can claim."

136.    Nichols concluded that:

> And considering that Lion has robust data, enough cash for two years, and catalysts such as a potential NASDAQ uplisting, I think the short/medium-term outlook is bullish. . . . In my opinion, after thoroughly studying this company, **I think it has some of the best upside potential in the sub-$100 million biotech market, and that Singh's involvement gives Lion a good chance to trade higher in the year ahead.**

137.    The statements and other representations in ¶¶ 132-136, *supra,* regarding the author's purported enthusiasm and "sparked interest" for Lion based on Lion's "robust" data, Singh's involvement, and "bullish outlook," and comments strongly favorable about Singh, were false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

138.    In addition, the representation that "**Singh's involvement gives Lion a good chance to trade higher in the year ahead,**" and "**Singh has a history of creating value for shareholders in the clinical biotechnology setting**" were especially misleading given that Singh only was able to increase the value of IMUC from engaging in the same promotional scheme that he was now perpetrating with Lion.

139.    The article also contained the following disclosure:

> I am long OTCQB:LBIO, IMUC.. I wrote this article myself, and it expresses my own opinions. **I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.**

140.     The statements referenced in ¶ 139, *supra,* regarding the lack of compensation received by Nichols, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

141.     As a result of the foregoing, "Lion Biotechnologies: 3 Bullish Reasons Why I Like This Speculative Biotech" was materially false and misleading at all relevant times.

142.     On November 25, 2013, Lion's shares closed at $5.45 and increased $1.95 on November 26, 2013, closing at $7.40, a 35.7% increase over two days.

### g.   The December 2, 2013 Promotional Article

143.     On December 2, 2013, Meyer published an article titled "2 Biotech Stocks Facing Major Catalysts in 2014" on *WallStCheatSheet.com*, portraying Lion as an up and coming biotechnology company whose stock price was about to explode. Meyer boasted that "[a]s of Friday's closing price of $8.42, shares have soared by nearly 80 percent since November 1 on expectations that the company's technology and catalysts in 2014 will turn Lion Biotechnologies into one of the premier biotechnology companies in the world." Meyer added that "Lion Biotechnologies" was one of "[t]wo biotech stocks facing major catalysts in 2014[.]"

144.     Meyer encouraged investors to buy Lion now before "catalysts in 2014" caused the stock to skyrocket. For instance, Meyer wrote that:

> Based on all of the above catalysts, Lion Biotechnologies is going to be extremely busy over the coming 12 months. The catalysts that have the most potential to send share prices soaring include the uplisting, the IND for Next-Gen T-cells, and the Phase 1 data on combination trials.
>
> *            *            *
>
> Based on these numbers, Lion Biotechnologies estimates that it could generate $1 billion in annual revenue at its peak sales of TIL therapy (based on the projected melanoma market in 2018, which amounts to $4 billion). Based on this potential and the number of catalysts in 2014, investors may want to consider getting in now before it's too late.

145.     The article did not disclose the writers' receipt of compensation for the article, or that the article was part of a paid promotion.

146.     The statements and other representations in ¶¶ 143-145, *supra,* which purported to represent the author's true opinions regarding Lion and Singh, were materially false and

misleading when made because the article failed to disclose that Lion had paid Meyer, through Lidingo, to publish the article.

147.   In addition, the representation that "*shares have soared by nearly 80 percent since November 1 on expectations that the company's technology and catalysts in 2014 will turn Lion Biotechnologies into one of the premier biotechnology companies in the world*" were especially misleading given that the reason shares were "soaring" was Singh personally editing and approving bullish articles regarding Lion's prospects without Lidingo disclosing his involvement or compensation.

148.   As a result of the foregoing, "2 Biotech Stocks Facing Major Catalysts in 2014" was materially false and misleading at all relevant times.

### h.   The December 9, 2013 Promotional Article

149.   On December 3, 2013, Lion paid Lidingo $20,000. Lidingo subsequently paid a writer $600 to publish an article about Lion securities. Six days later, on December 9, 2013, Lidingo published an article titled "4 Companies Developing Blockbuster Immunotherapies To Fight Cancer" on *Seeking Alpha*, under the pseudonym Glen S. Woods.

150.    The article compared Lion to three of the largest biotechnology companies in the industry, Merck, Bristol-Myers Squibb, and Roche. As in previous promotional articles, Woods also noted Singh's prior success with ImmunoCellular Therapeutics, stating that "Manish Singh, Ph.D., President and Chief Executive of Lion—who previously helmed ImmunoCellular Therapeutics (NYSEMKT:IMUC), taking it from a tiny OTC $6 million company to an almost $200 million dollar compan[y]."

151.   Woods expressed his enthusiasm for the stock, highlighting Lion's recent price increase and ability to finance the next two years of operations:

> I like the investment potential of Lion. The stock has been on a tear the past few sessions, closing on Friday. Dec. 6th at $11 per share. The company has a market cap of $170 million, and is developing a platform that could be worth billions per year. However, a major concern about any development biotech company is the ability to sustain its existence while developing its product. In November the company completed a private financing with gross proceeds of $23.3 million, netting the company approximately $21.6 million. The money was raised to secure the funds for Contego's phase III study as well as sponsor several other studies. Lion

estimates a burn rate of $10 million from the 4th quarter 2013 to 4th quarter 2014, giving the company enough working capital to operate for the next two years.

152.    Woods also suggested that Lion could become a potential acquisition target, stating that:

[G]iven the positive results of the phase II study I see Lion as an interesting play, not only as a longer-term investment, but also as a company that might be of interest to one of the giant pharmaceutical companies looking for collaboration or perhaps a buy-out.

153.    Woods also spun Lion's small size (relative to the three giants mentioned in the article) to suggest that Lion "has the potential for large gains if more positive news comes from its future clinical trials."

154.    The statements and other representations in ¶¶ 150-153, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, were materially false and misleading when made because the article failed to disclose that (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

155.    The article contained the following disclosure:

I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

156.    The statements and other representations in ¶ 155, *supra,* regarding the lack of any compensation to the author, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

157.    In addition, the representation ***"I like the investment potential of Lion. The stock has been on a tear the past few sessions, closing on Friday, Dec. 6th at $11 per share"*** was especially misleading given that the reason shares were "on a tear" was Singh personally editing and approving bullish articles regarding Lion's prospects without Lidingo disclosing his involvement or compensation. Further, the representation touting Singh's prior success with IMUC, "***taking it from a tiny OTC $6 million company to an almost $200 million dollar***

*compan[y]"* was also misleading given that Singh only was able to increase the value of IMUC from engaging in the same promotional scheme that he was now perpetrating with Lion.

158.    As a result of the foregoing, "4 Companies Developing Blockbuster Immunotherapies To Fight Cancer" was materially false and misleading at all relevant times.

### i.    The December 23, 2013 Promotional Article

159.    On December 23, 2013, Nichols published an article on *Seeking Alpha* titled "4 Stocks In 4 Industries That Could Make Significant Gains In 2014" touting the same narrative as past promotional articles. The article boasted that "[i]mpressive gains have already been seen since . . . [Lion's] merger [with Genesis], and 2014 should continue [] that trend."

160.    Again, Nichols emphasized catalysts that would send Lion's stock soaring. For instance, Nichols wrote:

> Now that you know the story and familiarized with the data, let's look at the catalysts and what makes Lion a potential double in 2014. According to the company's latest presentation, it needed approximately $10 million of cash to fund operations through the fourth quarter of 2014; Lion completed private financing and now has nearly $24 million. Therefore, it has enough cash for two years, which eliminates the overhang or fear of short-term dilution.

> \*       \*       \*

> Lion will give an update on its Phase 2 trial in the first quarter and then plans to meet with the FDA to begin Phase 3 testing, both of which will be major catalysts. Also, the company will complete licenses and submit an IND for its next-generation TILs and present data on its study with Zelboraf. Collectively, these catalysts could create a nice boost for shares of Lion, especially with a $135 million market cap.

> \*       \*       \*

> Additionally, investors should really like the amount of data that Lion has presented thus far, as most $135 million biotechnology companies have only early stage data, usually collected at one site. This data tends to be compared to historical averages. But the TILs data mirrors that of billion-dollar biotechs with multiple trial sites, robust patient data, and multiple years of follow-up analysis. Therefore, investors should really like what they see heading into 2014, as this little unknown biotech might very well be on everyone's radar by next year's end, with a steady dose of catalysts to push it significantly higher.

161.    Nichols also highlighted Lion's intention to list on the NASDAQ as yet another reason to purchase Lion stock. For instance, Nichols wrote that:

Currently, Lion is an OTC stock. But according to the company's presentation, Lion will seek a listing on the NASDAQ in the first quarter of 2014. With a price of $9.00 and a market capitalization of $135 million, it is likely that Lion is uplisted early next year. Clearly, by going from OTC to the NASDAQ, Lion will be visible to a larger audience of shareholders; and if completed by the first quarter, it will also be eligible for fund inclusion and also indexes like the Russell. These combined will serve as stock moving catalysts in early 2014.

162.   The statements and other representations in ¶¶ 160-161, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

163.   The article also contained the following disclosure:

I am long RH, OTCQB:LBIO. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

164.   The statements referenced in ¶ 163, *supra,* regarding the lack of any compensation to Nichols, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

165.   As a result of the foregoing, "4 Stocks In 4 Industries That Could Make Significant Gains In 2014" was materially false and misleading at all relevant times.

166.   On December 23, 2013, Lion's shares closed at $9.50, 5.5% higher than the previous trading day.

### j.   The January 15, 2014 Promotional Article

167.   On December 31, 2013, Singh responded to a draft article about Lion, "[t]his is okay to publish. I think I need to talk to [the writer] to explain how these technologies really work." Singh then instructed Bjorlin to have the article published. On January 15, 2014, Lidingo published an article on *Seeking Alpha* titled "Are Modified T-Cells A Game Changer In Treating Cancer?" under the pseudonym The Swiss Trader. The article explained Lion's TIL technology and explained why it might be a "game changer." As in past promotional articles, the Swiss Trader suggested that Lion presented an investment opportunity with potentially massive payoffs. For instance, the article concluded that:

Lion, along with its promising trial data, is worthy of your attention. This is a good stock to follow.

At this very moment, Lion is worth the attention that it has received. And if Novartis' data holds, we might learn that Lion too will see strong data in its Phase 3 trial, which would produce very large returns for shareholders.

168.    The statements and other representations in ¶ 167, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; (ii) Defendant Singh reviewed, edited and approved the article prior to publication; and (iii) Lidingo published the article using a false alias.

169.    The article also contained the following disclosure:

I am long LBIO,. [sic] I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.***

170.    The statements referenced in ¶ 169, *supra,* regarding the lack of any compensation to the author, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; (ii) Defendant Singh reviewed, edited and approved the article prior to publication; and (iii) Lidingo published the article using a false alias.

171.    As a result of the foregoing, "Are Modified T-Cells A Game Changer In Treating Cancer?" was materially false and misleading at all relevant times.

172.    On January 15, 2014, Lion's shares closed at $8.85, 4.1% higher than the previous day.

### k.   The February 6, 2014 Promotional Article

173.    On February 6, 2014, Nichols published an article titled "Combination Therapies: Where Immuno-Oncology Is Headed and How to Invest" on *Seeking Alpha*. The article painted a positive picture of Lion's prospects:

Keeping this in mind, part of being a good investor in this industry is foreseeing certain trends, using known information to predict where the industry might be headed. While Celldex, MacroGenics, and Lion all look to be developing promising candidates with the potential for widely used combination agents, this outlook is likely barely scratching the surface, as the gains to be created from such innovation is possibly unimaginable at

this very moment. Accordingly, invest in the companies with strong data that have the most to gain as this industry continues to innovate and transition from delaying the inevitable to finding an actual cure.

174.     The statements and other representations in ¶ 173, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

175.     The article also contained the following disclosure:

I am long LBIO, CLDX, BMY. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

176.     The statements referenced in ¶ 175, *supra,* regarding the lack of any compensation to Nichols, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

177.     As a result of the foregoing, "Combination Therapies: Where Immuno-Oncology Is Headed And How To Invest" was materially false and misleading at all relevant times.

### l.     The February 10, 2014 Promotional Article

178.     On February 10, 2014, Lidingo published an article titled "2 Young 'Cats' Of Biotech Poised To Climb Higher In 2014" on *Seeking Alpha* under the pseudonym Glen S. Woods. The highly laudatory article repeatedly claimed that the Company was undervalued and the stock would increase dramatically. For instance, Woods wrote:

I think Dr. Singh has a very good chance of striking gold again with Lion.

*              *              *

[I]f there are any rumbles of such action this stock should move significantly higher.

*              *              *

Lion is a $105 million market cap company. It is a pure development company and has come a long way in a very short time. As the company grows the stock could experience swings, as shown recently when the stock was hit hard. The stock drop was probably due to profit taking and investors exercising warrants from the earlier financing deal. However, the company is now in a better financial position, with $23 million in cash. That should keep Lion operational for the next 24 months, thus reducing

the risk of financing in the future, and stock dilution for quite some time. Lion stock closed on February 4th at $5.00 per share, which makes it an excellent entry point.

\*       \*       \*

Lion is not as advanced, but if 2013 is any indication of the direction the company will take in 2014, I think the company is well undervalued. And if a collaboration deal is struck, this stock could move considerably higher. Only time will tell which of the two biotech cats will be king of the biotech jungle.

179.     The statements and other representations in ¶ 178, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, and about Singh, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

180.     The article included the following disclosure:

I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

181.     The statements and other representations in ¶ 180, supra, regarding the author's lack of compensation for the article, were materially false and misleading when made because the article failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; and (ii) Lidingo used a false alias to publish the article.

182.      In addition, the representations "***I think Dr. Singh has a very good chance of striking gold again with Lion"*** and "Lion is not as advanced, ***but if 2013 is any indication of the direction the company will take in 2014, I think the company is well undervalued"*** were especially misleading given that the reason shares increased in value in 2013 was Singh personally editing and approving bullish articles regarding Lion's prospects without Lidingo disclosing his involvement or compensation.

183.     As a result of the foregoing, "2 Young 'Cats' Of Biotech Poised To Climb Higher In 2014" was materially false and misleading at all relevant times.

184.    On February 10, 2014, Lion's shares closed $5.25, and on February 11, 2014, closed at $5.65, thereby increasing 7.6%.

**m.  The February 18, 2014 Promotional Article**

185.    On January 20, 2014, Singh sent Lidingo an idea for an article on Lion securities, which resulted in the publication of the article on February 18, 2014, on *theCheatSheet.com*. John Rivers published the article, titled "Immune Checkpoint Blocker Race Heats Up." The article highlighted Lion's TIL technology, encouraging investors to "keep an eye on not only the checkpoints blockers alone, but also what other immunotherapies [such as Lion's technology] that are partnered with them."

186.    The article did not disclose the writers' receipt of compensation for the article, or that the article was part of a paid promotion.

187.    The article referenced in ¶¶ 185-186, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, was materially false and misleading when made because the article deliberately failed to disclose that: (i) Lion had paid the author, through Lidingo, to publish the article; (ii) Defendant Singh proposed the idea for the article as well as reviewed, edited and approved the article prior to publication; and (iii) Lidingo published the article using a false alias.

188.    As a result of the foregoing, "Immune Checkpoint Blocker Race Heats Up" was materially false and misleading at all relevant times.

**n.  The March 1, 2014 Promotional Article**

189.    On March 1, 2014, Nichols published an article titled "Modified T-Cells: Quietly Becoming Very Relevant" on *Seeking Alpha*. The article boasted that "if data holds in larger trials, we could be talking about massive gains for Lion . . . ."

190.    The article referenced in ¶ 189, *supra,* which purported to represent the author's true, highly positive opinions regarding Lion and its prospects, was materially false and misleading when made because the article deliberately failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

191.    The article included the following disclosure:

> I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. ***I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.***

192.    The statements referenced in ¶ 191, *supra,* regarding the lack of compensation received by the author, were materially false and misleading when made because the article failed to disclose that Lion had paid Nichols, through Lidingo, to publish the article.

193.    As a result of the foregoing, "Modified T-Cells: Quietly Becoming Very Relevant" was materially false and misleading at all relevant times.

194.    On March 3, 2014, Lion's shares closed at $6.10, 10.5% higher than on February 28, 2014, when the price closed at $5.52.

### 2.    Defendants Made False and Misleading Statements in Lion's SEC Filings

#### a.    Defendants' January 2014 Offering Documents Were Materially False and Misleading

195.    In October 2013, shortly after retaining Lidingo in September 2013, Lion entered into a securities purchase agreement with various institutional and individual accredited investors to raise gross proceeds of $23.3 million in a private placement (the "Private Placement"). On November 5, 2013, Lion completed the Private Placement, having raised $21.6 million in net proceeds.

196.    Shortly thereafter, Lion initiated a public offering to permit certain "selling stockholders" to sell their shares on the public market. On December 4, 2013, Lion filed with the SEC a Form S-1 Registration Statement, which was subsequently amended on January 7, 2014 and January 21, 2014. The January 21, 2014 Amended Registration Statement was declared effective on January 30, 2014. That same day, Lion published the January 30, 2014 Prospectus for 24,017,456 shares of common stock being offered by certain Lion stockholders, of which 3,895,300 shares were outstanding shares of common stock owned by some of Lion's stockholders, 7,750,000 were shares of common stock issuable upon the conversion of currently

outstanding shares of Lion's Series A Convertible Preferred Stock owned by some of Lion's stockholders, and 12,372,156 were shares issuable upon the exercise of currently outstanding common stock purchase warrants held by some of the warrantholders.

197.   The December 4, 2013 Registration Statement, the January 7, 2014 Amended Registration Statement, January 21, 2014 Amended Registration Statement, and the January 30, 2014 Prospectus (together the "January 30, 2014 Offering Documents") failed to disclose Lion's promotional efforts and Defendants' involvement in reviewing, editing, and approving the promotional articles touting the Company. Nor did the January 30, 2014 Offering Documents, disclose to investors that Lion was paying Lidingo to publish the promotional articles.

198.   In the January 30, 2014 Offering Documents, Lion identified possible fluctuations in its stock price as a potential event, but failed to disclose that Lion had significantly inflated Lion's share price by publishing bullish articles:

> **The market price of our stock may be adversely affected by market volatility.**
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:
>
> - announcements of the results of clinical trials by us or our competitors;
>
> - developments with respect to patents or proprietary rights;
>
> - announcements of technological innovations by us or our competitors;
>
> - announcements of new products or new contracts by us or our competitors;
>
> - actual or anticipated variations in our operating results due to the level of development expenses and other factors;
>
> - changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
>
> - conditions and trends in the pharmaceutical and other industries;
>
> - general economic, political and market conditions and other factors; and
>
> - the occurrence of any of the risks described in this prospectus.
>
> (emphasis in original)

199.    The risk disclosures above were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the January 30, 2014 Offering Documents filed with the SEC were materially false and misleading at all relevant times.

### b.    The Company's November 14, 2013 Form 10-Q And SOX Certifications Were Materially False and Misleading

200.    On November 14, 2013, Lion filed its quarterly report on Form 10-Q for the quarter ending September 30, 2013 with the SEC. The November 14, 2013 Form 10-Q was signed by Defendants Singh and Handelman. The November 14, 2013 Form 10-Q did not disclose that (i) Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the November 14, 2013 Form10-Q filed with the SEC was materially false and misleading.

201.    In accordance with SOX, the November 14, 2013 Form 10-Q was certified by Defendants Singh and Handelman, who each declared that:

> 1.    I have reviewed this Quarterly Report on Form 10-Q of Lion Technologies, Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report;
>
> *         *         *
>
> 5.    I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> *         *         *

b.)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

202.    The foregoing certifications were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles designed to inflate the price of Lion common stock; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) Lidingo used false aliases to publish the stories. As a result for the foregoing, the Company's SOX Certifications filed with the SEC on November 14, 2013, were materially false and misleading at all relevant times

### c.   The Company's March 28, 2014 Form 10-K and SOX Certifications Were Materially False and Misleading

203.    On March 28, 2014, Lion filed its annual report on Form 10-K for the fiscal year ending December 31, 2013. The March 28, 2014 Form 10-K was signed on March 27, 2014 by Defendants Singh and Handelman. The March 28, 2014 Form 10-K did not disclose that: (i) Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the March 28, 2014 Form 10-K filed with the SEC was materially false and misleading.

204.    In accordance with the Sarbanes-Oxley Act of 2002, the March 28, 2014 Form 10-K was certified by Defendants Singh and Handelman, who each declared that:

1.    I have reviewed this Report on Form 10-K of Lion Biotechnologies, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*        \*        \*

5.    I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

* * *

b.)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

205.    The foregoing certifications were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) accordingly, Singh and Handelman did not disclose the fraud to Lion's auditor. As a result of the foregoing, the Company's SOX Certifications filed with the SEC on March 28, 2014 was materially false and misleading at all relevant times.

### d.   The Company's May 14, 2014 Form 10-Q and SOX Certifications Were Materially False and Misleading

206.    On May 14, 2014, Lion filed its quarterly report on Form 10-Q with the SEC for the quarter ending March 31, 2014. The May 14, 2014 Form 10-Q was signed by Singh and Handelman.

207.    The May 14, 2014 Form 10-Q disclosed that the Company had received a subpoena from the SEC in relation to its investigation of Lion. Also in the May 14, 2014 Form 10-Q was a section entitled "Risk Factors." The risk disclosures failed to disclose the stock promotion scheme as a risk that could materialize for the Company and its shareholders, particularly in light of the SEC subpoena.

208.    The May 14, 2014 Form 10-Q stated, in relevant part, "[t]here have been no material changes from the risk factors previously disclosed in the [December 31, 2013 Form 10-K] report," which stated, in relevant part:

> ***The market price of our stock may be adversely affected by market volatility.***
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:
>
> •       announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this Annual Report.

(emphasis in original)

209. The risk disclosures above were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the Form 10-Q filed with the SEC on May 14, 2014 was materially false and misleading at all relevant times.

210. In accordance with SOX, the May 14, 2014 Form 10-Q was certified by Defendants Singh and Handelman, who each declared that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Lion Biotechnologies, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
>         *      *      *
>
> 5. I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

*     *     *

b.)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

211.    The foregoing certifications were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles designed to inflate the price of Lion common stock; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) Lidingo used false aliases to publish the stories. As a result of the foregoing, the Company's SOX Certifications filed with the SEC on May 14, 2014 were materially false and misleading at all relevant times.

### e.    The Company's September 11, 2014 Amended Registration Statement and September 30, 2014 Prospectus Were Materially False and Misleading

212.    On September 11, 2014, Lion filed a Post-Effective Amendment No. 1 to Form S-1 Registration Statement, which amended the Form S-1 Registration Statement declared effective on January 30, 2014 to include audited financial statements and the notes thereto included in Lion's annual report on Form 10-K for 2013 and quarterly report on Form 10-Q for periods ended June 30, 2014. The September 11, 2014 Amended Registration Statement was signed by Singh and Handelman, amongst others.

213.    On September 29, 2014, the SEC declared the September 11, 2014 Amended Registration Statement effective. The next day, Lion filed the September 30, 2014 Prospectus for 20,989,625 shares of common stock.

214.    The September 11, 2014 Amended Registration Statement and the September 30, 2014 Prospectus (together the "September 30, 2014 Offering Documents") failed to disclose Lion's promotional efforts and Defendants' involvement in reviewing, editing, and approving the promotional articles touting the Company. Nor did the September 2014 Offering Documents disclose to investors that Lion was paying Lidingo to publish the promotional articles.

215.   In the September 30, 2014 Offering Documents, Lion identified possible fluctuations in its stock price as a potential risk but failed to disclose that Lion had significantly inflated Lion's share price by publishing bullish articles:

> ***The market price of our stock may be adversely affected by market volatility.***
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:
>
> - announcements of the results of clinical trials by us or our competitors;
>
> - developments with respect to patents or proprietary rights;
>
> - announcements of technological innovations by us or our competitors;
>
> - announcements of new products or new contracts by us or our competitors;
>
> - actual or anticipated variations in our operating results due to the level of development expenses and other factors;
>
> - changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
>
> - conditions and trends in the pharmaceutical and other industries;
>
> - general economic, political and market conditions and other factors; and
>
> - the occurrence of any of the risks described in this prospectus.
>
> (emphasis in original)

216.   The risk disclosures above were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the September 30, 2014 Offering Documents filed with the SEC were materially false and misleading at all relevant times.

## C.    Additional Scienter Allegations

217.    As alleged above, Defendants Lion, Singh, Bjorlin, and Handelman acted with scienter in that they: (i) knew or recklessly disregarded that the statements identified above in Sections IV B 1 & 2 were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and/or (iv) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Lion's hidden stock promotion scheme, and their control over, and receipt or modification of Lion's materially false and misleading statements, actively participated in the fraudulent scheme alleged herein.

### 1.    Singh and Bjorlin's Direct Involvement in the Fraudulent Promotional Scheme Demonstrates Their Actual Knowledge

218.    Singh, as Lion's CEO, directed and oversaw Lidingo's work for the Company. Even prior to the Class Period, Singh approved all Lidingo articles about his prior company IMUC, instructed Lidingo writers not to disclose compensation, and directed Bjorlin to order writers not to disclose compensation.

219.    In September 2013, Singh and Bjorlin signed the contract that engaged Lidingo to provide promotional services for Lion and set out key terms of the fraudulent scheme. These terms included that: (i) Lidingo would create awareness of Lion through e-mail and other distribution mechanisms; (ii) in providing promotional services, Lidingo would use only materials approved by Lion; (iii) Lion would pay Lidingo $240,000 for 12 months, payable in monthly installments of $20,000; and (iv) Lion's payments would go towards covering expenses for Lidingo's work. As signatories, Singh and Bjorlin acknowledged these terms.

220.    During the Class Period, Singh provided input on article content, including suggesting an entire article which was later published under a pseudonym, gave directions to authors, suggested particular authors, and gave input on publication timing.

221.    Additionally, Singh knew that Lidingo publications about Lion would either not disclose compensation or would affirmatively misrepresent that the author had not been compensated. Indeed, on multiple occasions Singh instructed Bjorlin and writers specifically ***not*** to disclose compensation, as set forth above in ¶¶ 7, 46-50. As alleged above in ¶ 48, Singh knew that disclosing compensation made these communications less credible and less likely to be effective.

222.    Bjorlin also directly participated in the fraud. Lidingo was hired to draft the promotional articles and the text of the promotional articles that Lion published and approved. Bjorlin controlled Lidingo and performed the day-to-day work necessary to keep the stock promotion scheme running. She recruited writers to write articles for issuer clients and paid those writers using Lidingo accounts. Bjorlin communicated with writers to give instructions on the publication of specific articles. Bjorlin forwarded notes for potential articles to Singh who then reviewed, edited, and approved the articles. Bjorlin sought Singh's advice on which writers to hire, and specifically instructed writers not to disclose compensation. At all relevant times, Bjorlin was aware of *Seeking Alpha's* policy to disclose compensation, and deliberately worked with Singh to participate in a scheme to deceive investors into believing the articles were impartial.

### 2.    Lion, Singh, and Bjorlin Had Strong Financial Motives to Inflate the Price of the Lion's Shares

223.    Lion and Singh were financially motivated to conceal the Company's promotional scheme and the full extent of Lidingo's relationship with the Company. With no source of revenue, Lion's successful development of TIL and its continued existence were contingent upon raising capital to finance clinical trials. To this end, the Company completed a private placement on November 5, 2013 and subsequently conducted an offering in January 2014 to permit the shareholders to sell their shares. Indeed, Lion engaged in at least three additional offerings after January 2014 to raise over $70 million. Because the price at which Lion was authorized to sell shares of its common stock in each of these offerings was based upon the market price of such

shares, Lion and Singh had a clear incentive to artificially inflate this price so that the Company could generate maximum proceeds from this offering.

224.     Singh had an additional, massive incentive to boost Lion's shares. Under the merger agreement that converted Genesis into Lion, Singh would receive additional shares of common stock during the 12-month period following the merger, for each $1,000,000 of gross proceeds received by Lion from any financings, licensing or similar transaction. Singh was also entitled to additional shares of common stock if, during the 18 months following the closing of the merger, the closing price per share of the common stock equaled or exceeded $0.04, as adjusted for any stock split, reverse stock split, recapitalization or the like, and $100,000 of the common stock is traded for any 10 out of 30 consecutive trading days.

225.     Further, Singh's base salary was $34,000 until the Company raised at least $1,000,000 in additional financing, after which his salary would automatically increase to $350,000. This provided an enormous incentive for him to create the appearance of a successful stock in order to boost the likelihood of raising additional funds.

226.     Bjorlin also had an incentive to inflate the price of Lion's shares, as she had invested $100,000 into Lion and beneficially owned 150,000 shares of Lion common stock. Lidingo—which Bjorlin controlled—received 50,000 shares as part of its compensation for the promotional scheme. Indeed, Lidingo represented that its equity stakes were how it generated income. Accordingly, Bjorlin and Lidingo's compensation was directly tethered to the price of the Lion's stock, incentivizing them to inflate Lion's share price.

227.     Bjorlin and Singh had yet another incentive to further the promotional scheme. Through Lidingo and Lavos, Bjorlin and Singh shared profits from the enterprise and received cash and equity of at least $1 million from the promotional scheme involving issuers.

### 3.     The Promotional Scheme Affected One of Management's Core Concerns

228.     The fact that Lion's undisclosed stock promotion scheme directly involved the core concerns of Lion's management—raising funds and increasing stock price and volume—further supports a strong inference that Lion, Singh, and Handelman acted with scienter. The

Company expressly acknowledged in its public SEC filings that it was "largely dependent" on the development of its lead product candidate, TIL. Because the promotional articles, written and approved by Singh, specifically touted the putative success of the clinical trial for the purpose of enabling the Company to finance the same through the sale of its common stock at artificially inflated prices, Lion, Singh, and Handelman knowingly and/or recklessly issued the materially false and misleading statements alleged herein.

### 4. Handelman's Position and the Small Size of the Company Support a Strong Inference that He Knew of the Promotional Scheme

229. As Lidingo's CFO, Handelman was in charge of all financial reporting, accounting, billing, and all other tasks associated with his position. As a result of this position, Handelman knew, or was reckless in not knowing, that Singh signed a $240,000 contract with Lidingo and that Lion issued 50,000 shares of unregistered common stock to Lidingo. Indeed, Handelman signed the December 4, 2013, Registration Statement, which disclosed the existence of the very engagement—although the scope and substance of the services were not disclosed to the public at the time.

230. Moreover, during the Class Period, Handelman was one of the few full time employees at Lion. In September 2013, at the beginning of the Class Period, Singh and Handelman were the *only* full-time employees at Lion. By March 2014, the company had five full-time employees, and by March 2015, it still had only fourteen such employees. Accordingly, it reasonably can be inferred that Handelman was fully apprised of Singh's actions, as they related to the promotional fraud.

### 5. Singh and Handelman's SOX Certifications Support a Strong Inference of Scienter

231. Singh and Handelman, as Lion's executive officers and/or directors, controlled the contents of the Company's public SEC filings during the Class Period. Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance. By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning

the Company's retention of Lidingo to artificially inflate the price of Lion's common stock had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and incomplete. As a result, Singh and Handelman were responsible for the accuracy of Lion's public SEC filings, and were therefore responsible and liable for the representations contained therein or omitted therefrom.

232.    Indeed, as alleged herein, throughout the Class Period, Defendant Singh served as the Company's CEO, President, and Chairman of the Board of Directors. In these capacities, Defendant Singh signed: (i) the November 14, 2013 Form 10-Q; (ii) the March 28, 2014 Form 10-K; (iii) the May 14, 2014 Form 10-Q; (iv) the SOX Certifications filed on November 14, 2013, March 28, 2014, and May 14, 2014; (v) the December 4, 2013 Registration Statement; (vi) January 7, 2013 Amended Registration Statement; (vii) the January 21, 2014 Amended Registration Statement; and (viii) the September 11, 2014 Amended Registration Statement, each of which contained the material false and misleading statements alleged herein, as set forth above in ¶¶ 201, 204, 208, 210, and 215.

233.    In addition, as alleged herein, throughout the Class Period, Defendant Handelman served as the Company's CFO and Secretary. In this capacity, Defendant Handelman signed: (i) the November 14, 2013 Form 10-Q; (ii) the March 28, 2014 Form 10-K; (iii) the May 14, 2014 Form 10-Q; (iv) the SOX Certifications filed on November 14, 2013, March 28, 2014, and May 14, 2014; (v) the December 4, 2013 Registration Statement; (vi) January 7, 2013 Amended Registration Statement; (vii) the January 21, 2014 Amended Registration Statement; and (viii) the September 11, 2014 Amended Registration Statement, each of which contained the material false and misleading statements alleged herein, as set forth above in ¶¶ 201, 204, 208, 210, and 215.

234.    Further, for Lion's November 14, 2013 Form 10-Q, March 28, 2014 Form 10-K, and May 14, 2014 Form 10-Q that were filed with the SEC during the Class Period, Defendants Handelman and Singh separately executed certifications pursuant to SOX Section 302 attesting:

"I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

> a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that *material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us* by others within those entities, particularly during the period in which this report is being prepared.

### D.      Applicability of the Presumption of Reliance

235.     At all relevant times, the market for Lion's common stock was an efficient market for the following reasons, among others:

> (a)      Lion common stock was actively traded;[33]

> (b)      As a regulated issuer, Lion filed periodic reports with the SEC;

> (c)      Lion regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with financial press and similar reporting services; and

> (d)      Lion was followed by financial journalists as well as securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

236.     As a result of the foregoing, the market for Lion's securities promptly digested current information regarding Lion from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Lion's securities during the Class Period suffered similar injury through their purchase of Lion's securities at artificially inflated prices. The *Basic* presumption of reliance applies.

---

[33]     On February 26, 2015, Lion was listed and actively traded on the NASDAQ, a highly efficient and automated market.

237.    Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose the paid stock promotion scheme. Defendants had a duty to disclose that the promotional articles were in fact paid by Lion, but Defendants made no such disclosure. This information was material and would have significantly altered the total mix of information made available. Plaintiff and investors would have wanted to know this information, and, had Plaintiff and investors known this information, they would have avoided purchasing shares of Lion common stock at the prices they traded during the Class Period, if at all.

**E.    No Safe Harbor**

238.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as and were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

239.    Alternatively, to the extent the safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statement were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Lion who knew that those statements were false when made.

**F.    Class Action Allegations**

240.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all purchasers of the securities of Lion during the Class Period (the "Exchange Act Class"). Excluded from the Exchange Act Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

241.    The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lion common stock was actively traded. While the exact number of Exchange Act Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by Lion or its transfer agent, or brokers and nominees, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

242.    Plaintiff's claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

243.    Plaintiff will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class and securities litigation.

244.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein:

(b)    whether statements made by Defendants misrepresented material facts about the business, operations, and management of Lion; and

(c)    to what extent members of the Exchange Act Class have sustained damages and the proper measure of damages.

245.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### G.     Loss Causation

246.    As alleged herein, Defendants engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning the stock promotion scheme in which Lion paid Lidingo—a stock promoter—to publish on Lion's behalf articles by seeming third parties touting Lion's prospects and Lion's stock as a strong investment opportunity, but failed to disclose and/or affirmatively misrepresented that: (i) the articles were paid for by Lion and were not the result of the authors' independent judgments about Lion and (ii) Lion's CEO—Defendant Singh—in many cases suggested the topics and wrote or edited the articles and selected the specific authors as part of a stock promotion scheme with Defendant Bjorlin—the President and owner of Lidingo. Defendants' materially false or misleading statements and omissions of material fact, alleged above in Sections IV A & B, caused the price of Lion's common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiff and other Class Period purchasers of Lion common stock.

247.    Relying upon the integrity of the market price for Lion common stock and public information relating to the Company, Plaintiff and other Exchange Act Class members purchased or otherwise acquired Lion common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. Plaintiff and other Exchange Act Class members suffered actual economic loss and were damaged when the foreseeable risks of Defendants' fraudulent stock promotion scheme and concealed by Defendants' misstatements and omissions materialized through the public disclosure of new information concerning the existence of the scheme were revealed to the public through several partial disclosures over a three year period. These partial disclosures occurred on May 14, 2014; November 12, 2014, and April 10, 2017. As alleged above in ¶¶ 85-86, 89, and 92-94, and in this Section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of Lion common stock by removing portions of the artificial inflation in the price of Lion common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Lion common stock in response to the public

disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negate any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

248.    As set forth in ¶¶ 85-86 above, on May 14, 2014, it became apparent to industry insiders that the SEC was looking beyond Galena in connection with its stock promotion fraud investigation when Lion disclosed in its Form 10-Q for the first quarter of 2014, that it had received a subpoena on April 23, 2014 from the SEC, stating in pertinent part:

> On April 23, 2014, the Company received a subpoena from the Securities [and] Exchange Commission (the "SEC") that stated that the staff of the SEC is conducting an investigation *In the Matter of Galena Biopharma, Inc. File No. HO 12356* and that the subpoena was issued to the Company as part of the foregoing investigation. Galena Biopharma is an unaffiliated, publicly-held biopharmaceutical company. In the Form 10-K that Galena Biopharma, Inc. filed with the SEC on March 17, 2014, Galena Biopharma stated that the SEC is investigating certain matters relating to Galena Biopharma and an outside investor-relations firm that it retained in 2013. The SEC's subpoena and accompanying letter do not indicate whether the Company is, or is not, under investigation. The Company has contacted the SEC's staff regarding the subpoena, and the Company is cooperating with the SEC.

> The subpoena requires the Company to give the SEC, among other materials, all communications between anyone at the Company and certain persons and entities (which include investor-relations firms and persons associated with the investor-relations firms), all documents related to the listed persons and entities, all articles regarding the Company posted on certain equity research or other financial websites, and documents and communications related to individuals who post or have posted articles regarding the Company on equity research or other financial websites.

249.    Based upon Lion's disclosure, author Feuerstein wrote an article on May 14, 2014, reporting the Lion filing and suggesting the existence of a widespread SEC investigation into stock promotion and small biopharma companies. He noted links between Lion and other users of stock promoters, including Singh's actions at IMUC and the fact that Lion shared a board member with Galena—Galena's Chairman Sanford Hillsberg.[34]

250.    The disclosure of Lion's involvement in a widespread SEC investigation into stock promotion and small biopharma companies were foreseeable consequences of, and within

---

[34]    "SEC Casting Wide Net in Galena Investigation," A. Feuerstein, *theStreet*, May 14, 2014, https://www.thestreet.com/story/12709211/1/sec-casting-wide-net-in-galena-investigation.html.

the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Lion's involvement in illegal stock promotion activities. Moreover, the May 14, 2014, disclosures, revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning Lion's involvement in illegal stock promotion activities. Thus, the May 14, 2014, disclosures, also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's illegal stock promotion activities that Defendants knowingly and/or recklessly concealed from investors.

251.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Lion common stock declined by $1.00 per share, or 10.9%, from an opening price of $9.20 on May 14, 2014 to a closing price of $8.20 on that day on heavy trading volume, thereby removing a portion of the artificial inflation in the price of Lion common stock. Lion's shares declined by an additional $0.48 over the next two trading days, for a total decline of more than 16%.

252.    Despite this partial disclosure of previously misrepresented and/or concealed material facts on May 14, 2014, the price of Lion common stock remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Lion's involvement in the illegal stock promotion scheme.

253.    As set forth above in ¶ 89, a second partial disclosure occurred on November 12, 2014, after the close of trading. On that date, Lion issued a press release entitled "Lion Biotechnologies Announces Management Change," announcing the resignation of Defendant Singh, ostensibly for "personal reasons."

254.    Two days later, on November 14, 2014, Pearson published an article entitled "More Fallout From Stock Promotion Scandal" on *Seeking Alpha*. The article suggested that Singh was fired for his role in the scandal, stating:

> As it turns out, the fallout is not yet done. It looks like there are additional companies, including those above, which are being impacted. The most obvious one is Lion Biotechnologies (OTCQB:LBIO), which disclosed

that it had been subpoenaed in April in connection with the SEC's investigation of Galena.

Following an internal investigation at Galena, CEO Mark Ahn "resigned" for personal reasons. More recently, Lion Bio's CEO Manish Singh just announced that he is also resigning for "personal reasons."

255.    Pearson's article went on to tie Lidingo—the stock promotion firm involved in the overall stock promotion scandal—to a company known as Lavos and then connected Singh to Lavos:

It should be noted that the compensation awarded to Lavos (AKA Maria Santos) and the description of the duties involved is identical to those laid out in the similar ADMD contract for Lidingo.

Lest there be any doubt about the similarity between the two, the last page of the Lavos contract actually has a typo on it, which should remove all doubt. In the signature page, Advanced Medical Isotope forgot to change the signatory name and instead left in "Kamillia Bjorlin" of Lidingo. From the first page, we can see that this contract was made out for Lavos. The point of this is that both companies are serving the identical function.

Why does all of this matter?

As it turns out, Ms. "Santos" is in fact Mrs. Maria Singh, the wife of Lion Bio's just-resigned CEO who resigned for "personal reasons." This can be found out by looking at the information on file for Lavos with the Nevada Secretary of State. It clearly shows Maria S. Singh as the managing member.

256.    The disclosure of Singh's dismissal, and the tying of that dismissal to Singh's direct involvement in the matters at the center of the SEC's investigation into illegal stock promotion and small biopharma companies, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Lion's involvement in illegal stock promotion activities. Moreover, the November 12 and 14, 2014 disclosures, revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning Lion's involvement in illegal stock promotion activities. Thus, the November 12 and 14, 2014 disclosures, also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the

Company's illegal stock promotion activities that Defendants knowingly and/or recklessly concealed from investors.

257.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Lion common stock declined by $0.75 per share, or 11.2%, from a closing price of $6.70 on November 12, 2014 to a closing price of $5.95 on November 13, 2014, on heavy trading volume, thereby removing a portion of the artificial inflation in the price of Lion common stock. Lion's shares declined by an additional $0.05 or .84% on November 14, 2014, for a total decline of 12%.

258.    Despite this partial disclosure of previously misrepresented and/or concealed material facts on November 12 and 14, 2014, the price of Lion common stock remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Lion's involvement in the illegal stock promotion scheme.

259.    As set forth above in ¶¶ 92-94, a third disclosure occurred on April 10, 2017. On that date, the SEC issued a press release stating that it had "announced the enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes that left investors with the impression they were reading independent, unbiased analyses on investing websites while writers were being secretly compensated for touting company stocks."

260.    On the same day, the SEC published cease-and-desist orders in connection with administrative proceedings against Lion, Singh, and Lavos for violations of the securities laws. In the Order Instituting Cease-and-Desist Proceedings against Lion, the SEC revealed that:

> From September 2013 to March 2014, Lion, through its former Chief Executive Officer, Manish Singh, engaged in a scheme to mislead investors by commissioning over 10 internet publications and 20 widely distributed emails promoting Lion to potential investors that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish articles about Lion on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. Singh actively participated in Lidingo's promotional work for Lion and understood that Lidingo was using writers who would not disclose that Lion was indirectly compensating them for their publications.

261.    The disclosure of SEC's issuance of an agreed to cease and desist order against Lion, Singh and Singh's company Lavos in connection with illegal stock promotion activities

undertaken on behalf of Lion, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Lion's involvement in illegal stock promotion activities. Moreover, the April 10, 2017, disclosures, revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct. These disclosures finally revealed the entirety of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning Lion's involvement in illegal stock promotion activities. Thus, the April 10, 2017 disclosures, also revealed the materialization of the known foreseeable risks surrounding the Company's illegal stock promotion activities that Defendants knowingly and/or recklessly concealed from investors.

262.    As a direct and proximate result of these corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Lion common stock declined by $0.19 per share, or 3%, on April 10, 2017, and an additional $0.16, over the next two trading days, for a total decline of 5.4%.

263.    The material misrepresentations and omissions alleged above had the effect of causing the prices for Lion common stock to be artificially inflated throughout the Class Period. Plaintiff and other Exchange Act Class members purchased or otherwise acquired Lion common stock at prices that were artificially inflated as a result of Defendants' misrepresentations and omissions of material fact alleged herein.

264.    Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiff and other Exchange Act Class members. Throughout the Class Period, the prices at which Plaintiff and other Exchange Act Class members purchased Lion common stock were artificially inflated as a result of Defendants' materially false or misleading statements and omissions of material fact concerning Lion's involvement in an illegal stock promotion scheme. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiff and other Exchange Act Class members would not have purchased or otherwise acquired Lion common stock at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that misrepresenting and concealing these material

facts and risks from the public would cause the prices of Lion common stock to be artificially inflated, or maintain existing artificial inflation. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Lion common stock to decline, as the inflation resulting from Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the price of Lion common stock.

265.     Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and to the other members of the Exchange Act Class who purchased or otherwise acquired Lion common stock during the Class Period.

266.     The economic losses, *i.e.*, damages, suffered by Plaintiff and other Exchange Act Class members are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact, which caused the price of Lion common stock to be artificially inflated; and (ii) the subsequent significant decline in the price of Lion common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized on the dates addressed above.

**H.     Exchange Act Causes of Action**

## COUNT ONE

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Lion, Singh, Handelman, and Bjorlin**

267.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

268.     During the Class Period, Defendants named in this cause of action participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.     The Defendants named in this count made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. More specifically, Defendants Lion

and Singh—or, in the alternative, Bjorlin—exercised ultimate authority over and, therefore, made the statements alleged in Section IV.B.1. Singh approved and adopted these statements within the scope of his employment as CEO, and with authority to act on behalf of Lion. In the alternative, Bjorlin approved and adopted these statements as owner and sole managing member of Lidingo. Additionally, Defendants Lion, Singh, and Handelman exercised ultimate authority over and, therefore, made the statements alleged in Section IV.B.2.

270.    The Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Lion as specified herein.

271.    The Defendants named in this count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The material misrepresentations and/or omissions made by the Defendants named in this count were done knowingly or recklessly and for the purpose and effect of concealing Lion's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the false and misleading statements during the Class Period of the Defendants named in this count, if they did not have actual knowledge of the misrepresentations and omissions alleged, were highly reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

272.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Lion's securities was artificially inflated during the Class Period.

273.    In ignorance of the fact that market prices of Lion's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was

known to or recklessly disregarded by the Defendants named in this count but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Exchange Act Class acquired Lion's securities during the Class Period at artificially high prices and were damaged thereby.

274.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Exchange Act Class and the marketplace known the truth regarding Lion's financial results and condition, Plaintiff and other members of the Exchange Act Class would not have purchased or otherwise acquired Lion's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

275.    By virtue of the foregoing, the Defendants named in this count have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

276.    As a direct and proximate result of the wrongful conduct of the Defendants named in this count, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

277.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT TWO

### Violation of Section 10(b) of the Exchange Act and Rule 10(b)(5)(a)&(c)
### Against Defendants Lion, Singh, and Bjorlin

278.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

279.    During the Class Period, Defendants named in this count carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Exchange Act Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Exchange Act Class to purchase and/or sell Lion's securities at artificially inflated and distorted prices. In furtherance of this

unlawful scheme, plan and course of conduct, the Defendants made the false statements and engaged in other unlawful acts as alleged herein.

280.    The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the true financial condition of Lion and conceal adverse material information about the business, operations and future prospects of Lion as specified herein.

281.    The Defendants named in this count employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lion's revenue, income, value and performance and continued substantial growth. As set forth more particularly herein, these acts included (i) making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lion and its business operations and financial condition in light of the circumstances under which they were made, not misleading, (ii) hiring Lidingo to promote Lion; (iii) paying Lidingo $20,000 a month and 50,000 shares of unregistered securities; (iv) paying writers, through Lidingo, to write promotional articles about Lion; (v) concealing writers' compensation or relationship with Lidingo or Lion from investors; (vi) using pseudonyms to conceal author's identities; and (vii) reviewing and approving the promotional articles. These practices and course of business operated as a fraud and deceit upon the purchasers of Lion securities during the Class Period.

282.    As a result of Defendants' fraudulent scheme, and failure to disclose material facts, as set forth above, the market price for Lion's securities was artificially inflated during the Class Period.

283.    In ignorance of the fact that market prices of Lion's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was

known to or recklessly disregarded by the Defendants named in this count but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Exchange Act Class acquired Lion's securities during the Class Period at artificially high prices and were damaged thereby.

284.    At the time of said misrepresentations and omissions that were made as part of Defendants' fraudulent scheme, Plaintiff and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Exchange Act Class and the marketplace known the truth regarding Lion, Plaintiff and other members of the Exchange Act Class would not have purchased or otherwise acquired Lion's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

285.    By virtue of the foregoing, the Defendants named in this count have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a)&(c) promulgated thereunder.

286.    As a direct and proximate result of the wrongful conduct of the Defendants named in this count, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

287.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action

## COUNT THREE

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Singh and Handelman

288.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

289.    Defendants named in this count acted as controlling persons of Lion within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Lion's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public and/or the materially false statements made by or at the direction of Lidingo, Defendants named in this count had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Lion, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Defendants named in this count were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

290.    In particular, Defendants named in this count had direct and supervisory involvement in the day-to-day operations of Lion, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

291.    As set forth above, Lion violated Section 10(b), and Rule 10b-5 promulgated thereunder, by its acts and omissions as alleged in this Complaint.

292.    By virtue of their positions as controlling persons, the Defendants named in this count are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

293.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## V.    VIOLATIONS OF THE SECURITIES ACT

294.    The Registration Statement and accompanying offering documents filed with the SEC in September 2014, contained material false and misleading statements and omitted to state other facts necessary to make the statements made not misleading. Plaintiff expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless

misconduct, as this claim is based solely on claims of strict liability or negligence under the Securities Act.

**A.    September 2014 Amended Registration Statement & Prospectus**

295.    On September 11, 2014, Lion filed a Post-Effective Amendment No. 1 to Form S-1 Registration Statement, which amended the December 4, 2014, Registration Statement and subsequent amendments to include audited financial statements and the notes thereto included in Lion's annual report on Form 10-K for 2013 and quarterly report on Form 10-Q for periods ended June 30, 2014. The September 11, 2014 Amended Registration Statement was signed by Defendants Singh and Handelman, amongst others.

296.    On September 29, 2014, the SEC declared the September 11, 2014 Amended Registration Statement effective. The next day, Lion filed the September 30, 2014 Prospectus for 20,989,625 shares of common stock.

297.    The September 30, 2014 Offering Documents failed to disclose Lion's promotional efforts and Defendants' involvement in reviewing, editing, and approving the promotional articles touting the Company. Nor did the September 30, 2014 Offering Documents disclose to investors that Lion was paying Lidingo to publish the promotional articles.

298.    In the September 30, 2014 Offering Documents, Lion identified possible fluctuations in its stock price as a potential risk but failed to disclose that Lion had significantly inflated Lion's share price by publishing bullish articles:

> ***The market price of our stock may be adversely affected by market volatility.***
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:
>
> - announcements of the results of clinical trials by us or our competitors;
>
> - developments with respect to patents or proprietary rights;
>
> - announcements of technological innovations by us or our competitors;
>
> - announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this prospectus.

(emphasis in original)

299.    The risk disclosures above were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles. As a result of the foregoing, the September 30, 2014 Offering Documents filed with the SEC were materially false and misleading at all relevant times.

### B.    Class Action Allegations

300.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities of Lion during the Class Period in or traceable to the Offering ("Securities Act Class"). Excluded from the Securities Act Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

301.    The members of the Securities Act Class are so numerous that joinder of all members is impracticable. While the exact number of Securities Act Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by Lion or its transfer agent, or brokers and nominees, and may be notified of the

1    pendency of this action by mail, using the form of notice similar to that customarily used in

2    securities class actions.

3          302.   Plaintiff's claims are typical of the claims of the members of the Securities Act

4    Class as all members of the Securities Act Class are similarly affected by Defendants' wrongful

5    conduct in violation of federal law that is complained of herein.

6          303.   Plaintiff will fairly and adequately protect the interests of the members of the

7    Securities Act Class and has retained counsel competent and experienced in class and securities

8    litigation.

9          304.   Common questions of law and fact exist as to all members of the Securities Act

10    Class and predominate over any questions solely affecting individual members of the Securities

11    Act Class. Among the questions of law and fact common to the Securities Act Class are:

12                (a)     whether the Securities Act was violated by Defendants as alleged herein:

13                (b)     whether statements made by Defendants misrepresented material facts

14    about the business, operations, and management of Lion; and

15                (c)    to what extent members of the Securities Act Class have sustained

16    damages and the proper measure of damages.

17          305.   A class action is superior to all other available methods for the fair and efficient

18    adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

19    the damages suffered by individual Securities Act Class members may be relatively small, the

20    expense and burden of individual litigation make it impossible for members of the Securities Act

21    Class to individually redress the wrongs done to them. There will be no difficulty in the

22    management of this action as a class action.

23        **C.**    **Securities Act Causes of Action**

24                                  **COUNT FOUR**

25               **For Violations of Section 11 of the Securities Act**
                        **Against Lion, Singh, and Handelman**

26          306.   Plaintiff repeats and realleges each and every allegation contained in Sections IV

27    A & B above and this Section V. For purposes of this Count, Plaintiff expressly excludes and

28

disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class, against Lion, Singh, and Handelman in connection with the offering on September 2014, ("the Offering") with which the aforementioned Defendants were involved.

307. The September 11, 2014 Amended Registration Statement issued in connection with the Offering contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. The September 11, 2014 Amended Registration Statement further omitted to state material facts required to be stated therein as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the September 11, 2014 Amended Registration Statement.

308. Defendants' liability under this Count is predicated on the participation of each defendant in conducting the Offering pursuant to the September 11, 2014 Amended Registration Statement that contained untrue statements and omissions of material fact. Any allegations or claims of fraud, fraudulent conduct, intentional misconduct and/or motive are specifically excluded from this Count. Plaintiff asserts only strict liability and negligence claims. Lion is the registrant and, as such, is strictly liable to Plaintiff and the Securities Act Class for untrue statements and omissions contained in the September 11, 2014 Amended Registration Statement.

309. Each of the individual Defendants named in this Count is liable as they each signed or authorized the signing of the September 11, 2014 Amended Registration Statement. By virtue of signing the September 11, 2014 Amended Registration Statement, they issued, caused to be issued and participated in the issuance of the September 11, 2014 Amended Registration Statement, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading and omitted to state material facts required to be stated therein. These Defendants failed to conduct a reasonable investigation and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

310.     Plaintiff and the other members of the Securities Act Class likewise did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Offering materials, including the registration statement, when they purchased or acquired shares of Lion's common stock. Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed. Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiff and the Securities Act Class.

311.     Plaintiff and the other members of the Securities Act Class were damaged by the difference between the price at which they purchased Lion shares pursuant to the Offering and the price at which they sold those shares or, if held through the date of the initial complaint in this matter, the price upon the date that the initial complaint was filed.

### COUNT FIVE
### For Violations of Section 12(a)(2) of the Securities Act
### Against Lion

312.     Plaintiff repeats and realleges each and every allegation contained above in Sections IV A & B above and this Section V as if fully set forth herein. For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, by Plaintiff and other members of the Securities Act Class who purchased or otherwise acquired common stock in the Offering against Lion.

313.     Lion offered, solicited, promoted and/or sold Lion's common stock to Plaintiff by the use of means or instrumentalities of interstate commerce by means of the defective September 30, 2014 Prospectus, for their own financial gain. By means of the defective Prospectus created and disseminated by Lion in connection with Lion's Offering, Lion assisted in the offering of shares of Lion stock to Plaintiff and other members of the Securities Act Class.

314.     The September 30, 2014 Prospectus contained untrue statements of material fact and omitted to disclose material facts, as detailed above. The facts misstated and omitted would

have been material to a reasonable person reviewing the Prospectus. Lion owed Plaintiff and the other members of the Securities Act Class who acquired Lion stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements to ensure that such statements were true and that there were no omissions to state a material fact required to be stated in order to make the statements contained therein not misleading.

315.    Lion did not make a reasonable and diligent investigation of the statements contained in the September 30, 2014 Prospectus and did not possess reasonable grounds for believing that it did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Lion, in the exercise of reasonable care, should have known of the untrue statements and omissions as set forth above and/or should have updated investors regarding material information about the Offering. Accordingly, Lion is liable to Plaintiff and members of the Securities Act Class who purchased common stock in the Offerings.

316.    Plaintiff and members of the Securities Act Class purchased or otherwise acquired Lion securities pursuant to the defective September 30, 2014 Prospectus. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the September 30, 2014 Prospectus at the times Plaintiff acquired Lion stock during the Class Period. Plaintiff purchased Lion common stock pursuant to and/or traceable to the defective September 30, 2014 Prospectus and, as a direct and proximate result of such violations, Plaintiff and the other Securities Act Class members sustained substantial damages.

317.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed. Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiff and the Securities Act Class.

318.    Plaintiff and the other members of the Securities Act Class were damaged by the difference between the price at which they purchased Lion shares pursuant to the Offering and the price at which they sold those shares or, if held through the date of the initial complaint in this matter, the price upon the date that the initial complaint was filed.

**COUNT SIX**
**For Violations of Section 15 of the Securities Act**
<u>**Against Singh and Handelman**</u>

319.    Plaintiff repeats and realleges each and every allegation contained above in Sections IV A & B and this Section V as if fully set forth herein. For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

320.    This Count is brought pursuant to Section 15 of the Securities Act against Defendants Singh and Handelman. At all relevant times, the Defendants named herein were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of these Defendants served as an executive officer or director of Lion prior to and at the time of the Offerings. At all relevant times, these Defendants had the power, influence and control over the operation and management of the Company and the conduct alleged herein. Each conducted and participated, directly and indirectly, in the conduct of Lion's business affairs. As officers of a publicly owned company, Defendants Singh and Handelman had a duty to disseminate accurate and truthful information with respect to Lion's financial condition and results of operations.

321.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiff and the other members of the Securities Act Class who purchased securities in the Offering or traceable to it. As a direct and proximate result of the conduct of these Defendants, Plaintiff and other members of the Securities Act Class suffered damages in connection with their purchase or acquisition of Lion common stock.

322.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed. Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiff and the Securities Act Class.

323.     Plaintiff and the other members of the Securities Act Class were damaged by the difference between the price at which they purchased Lion shares pursuant to the Offering and the price at which they sold those shares or, if held through the date of the initial complaint in this matter, the price upon the date that the initial complaint was filed.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Lead Plaintiff and the members of the Classes damages, including interest;

C.     Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## VII.     DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: September 8, 2017                                 Respectfully submitted,


                                                        KESSLER TOPAZ MELTZER
                                                          & CHECK, LLP

                                                        /s/ Geoffrey C. Jarvis
                                                        GEOFFREY C. JARVIS (*pro hac vice*)
                                                        MEGAN KONESKI (*pro hac vice*)
                                                        280 King of Prussia Road
                                                        Radnor, PA 19087
                                                        Tel:     (610) 667-7706
                                                        Fax:     (610) 667-7056
                                                        gjarvis@ktmc.com
                                                        mkoneski@ktmc.com
                                                        -and-
                                                        PAUL A. BREUCOP (Bar No. 278807)
                                                        One Sansome Street, Suite 1850
                                                        San Francisco, CA 94104
                                                        Tel:     (415) 400-3000
                                                        Fax:     (415) 400-3001
                                                        pbreucop@ktmc.com

                                                        *Counsel for Lead Plaintiff Jay Rabkin*
                                                        *and Lead Counsel for the Putative Class*

1

## **CERTIFICATE OF SERVICE**

2

   I hereby certify that on September 8, 2017, I authorized the electronic filing of the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

5

   I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.

7

Executed on September 8, 2017.

8

9
                                    KESSLER TOPAZ MELTZER
                                      & CHECK, LLP

10
                                    */s/ Geoffrey C. Jarvis*
11                                  GEOFFREY C. JARVIS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 3:17-cv-02086-SI Desilvio v. LION BIOTECHNOLOGIES, INC. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon A Amjed**
  namjed@ktmc.com,mswift@ktmc.com
- **Ryan Thomas Degnan**
  rdegnan@ktmc.com
- **Eli Greenstein**
  egreenstein@ktmc.com,jhouston@ktmc.com,rnathcook@ktmc.com,
  yjayasuriya@ktmc.com
- **Geoffrey C Jarvis**
  gjarvis@ktmc.com,dpotts@ktmc.com
- **Megan Koneski**
  mkoneski@ktmc.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,
  lpvega@pomlaw.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomla
  w.com
- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

☐ (No manual recipients)