UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAY RABKIN, et al.,

　　　　　Plaintiffs,

　　v.

LION BIOTECHNOLOGIES, INC., et al.,

　　　　　Defendants.

Case No. 17-cv-02086-SI

**ORDER RE MOTIONS TO DISMISS**

Re: Dkt. Nos. 62, 69, 71

　　　Defendants Lion Biotechnologies, Inc. ("Lion"), Michael Handelman, Kamilla Bjorlin, and Manish Singh move to dismiss the amended complaint filed by lead plaintiff Jay Rabkin. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument. After reviewing the parties' arguments and materials, the Court GRANTS in part and DENIES in part the motions.

**BACKGROUND[1]**

　　　Lead plaintiff Rabkin brings this action on behalf of himself and all others similarly situated who purchased or otherwise acquired Lion common stock between September 27, 2013 and April 10, 2017. Amended Compl. ("AC") (Dkt. No. 51) at 5. Plaintiff alleges claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, the Securities and Exchange Commission ("SEC") Rule 10b-5, and Sections 11(a), 12(a)(2), and 15 of the Securities

---

[1] The following background facts are taken from the allegations in the Amended Complaint, which for the purposes of this motion must be taken as true. Additionally, defendants have submitted several requests for judicial notice of documents referenced in the Amended Complaint or otherwise publicly available on government websites. Dkt. Nos. 64, 70, 73, 80. Plaintiff does not object to these requests. Opp'n at 8 n.2. The Court GRANTS the requests for judicial notice.

Act of 1933. *Id.* These claims are asserted against four defendants: (1) corporate defendant Lion, now known as Iovance Biotherapeutics, Inc.; (2) Manish Singh, former Chief Executive Officer ("CEO") of Lion from July 24, 2013 to December 31, 2014; (3) Michael Handelman, former Chief Financial Officer ("CFO") of Lion from February 7, 2011 to June 8, 2015; and (4) Kamilla Bjorlin, who organized and operated stock promotion company Lidingo. *Id.* ¶¶ 27-30.

In July 2011, Singh and Bjorlin allegedly began a stock promotion scheme. *Id.* ¶ 39. Singh founded a stock promotion company named Lavos, for which Singh's wife was the managing member and sole principal but Singh was the "only true employee and operational member." *Id.* One month later, Singh began working with Bjorlin to form another stock promotion company, Lidingo. *Id.* ¶ 40. Bjorn was the only managing member of Lidingo. *Id.*

Lavos and Lidingo worked together to provide stock promotion services to publicly traded companies between September 2011 and March 2014. As part of this work, "the issuers paid Lidingo and Lavos for the promotions, and in turn, Lidingo paid writers to write articles about the issuers that were published on investment websites like *Seeking Alpha*." *Id.* ¶ 41. Singh would find issuer clients for Lavos and Lidingo, provide ideas for and edit the articles, and at times direct which writer should draft an article. *Id.* ¶ 42. Bjorlin would perform the day-to-day promotional work, including coordinating the publication of articles about clients. *Id.* Additionally, "Bjorlin's ghost-writers would use a variety of aliases," "post articles on third party websites," and "claim to be established, credible investment professionals." *Id.* ¶ 45. Singh and Bjorlin instructed writers not to disclose their compensation. *Id.* ¶¶ 46-49. At Singh and Bjorlin's direction, "none of the over 400 promotional articles published by Lidingo and Lavos disclosed compensation from the public company clients, and at least 200 of the articles published on *Seeking Alpha* affirmatively misrepresented that the author did not receive compensation." *Id.* ¶ 50.

In September 2011, while Singh was CEO of ImmunoCellular Therapeutics, Ltd. ("IMUC"), a publicly traded company, he hired Lidingo to perform promotional work for IMUC. *Id.* ¶ 51. During the period when Lidingo provided services for IMUC, "Singh had ultimate approval authority for all IMUC articles, and took part in providing content for the articles as well as editing the articles." *Id.* ¶ 53. Additionally, between January 2012 and March 2014, Lidingo

provided stock promotion services to biotechnology company Galena Biopharma, Inc. *Id.* ¶ 57. During this period, Singh also "had approval authority for Galena articles, and took part in providing content for the articles as well as editing." *Id.* ¶ 59. Many of the articles that Lidingo arranged to be written about IMUC or Galena were by "ghost-writers" and none disclosed compensation. *Id.* ¶¶ 52, 58.

On July 24, 2013, Genesis Biopharma, Inc. entered into a merger agreement with Lion, and Singh was appointed CEO. *Id.* ¶ 62. Singh was entitled to incentives based on the performance of Lion's stock. *Id.* ¶ 63. He "immersed Lion in his stock promotion scheme by retaining Lidingo in September 2013." *Id.* ¶ 66. "The contract with Lidingo required Lion to pay $240,000 for 12 months of service at a rate of $20,000 per month and issue 50,000 shares of Lion stock to Lidingo." *Id.* Lidingo used these funds, in part, "to cover the expense of paying authors to write favorable articles about Lion." *Id.* Ultimately, "Lion paid Lidingo more than $230,000 in the six month period from the end of September 2013 through March 2014, before cancelling the agreement in April 2014." *Id.*

In exchange, Lidingo "paid writers to publish bullish articles and blog entries about Lion on investment websites," some of which were ghost-written by Lidingo and published under pseudonyms. *Id.* ¶ 67. None of the articles disclosed the writers' or Lidingo's compensation, or that the articles were part of a paid promotion. *Id.* Some articles "affirmatively misrepresented that the author had not been compensated." *Id.* As Lion's CEO, Singh "contributed to the Lidingo articles, reviewed and edited them, and controlled the timing of their publication." *Id.* ¶ 68.

Overall, defendants had at least fourteen promotional articles published about Lion between September 2013 and March 2014. *Id.* ¶ 71. Lidingo also hired a vendor to coordinate the distribution of emails describing public company securities, including Lion, to a list of potential investors between July 2013 and March 2014. *Id.* ¶ 72. Lidingo did not disclose that it had been compensated by the issuers, and Singh approved the expense of having Lidingo work with a vendor to send the emails. *Id.* Plaintiff alleges that the promotional articles were materially false and misleading because they affirmatively misstated or omitted material facts. *Id.* at 31.

In October 2013, Lion entered into a securities purchase agreement to raise gross proceeds in a private placement. *Id.* ¶ 195. By November 5, 2013, it completed the private placement with $21.6 million in net proceeds. *Id.* Lion then initiated a public offering to permit certain "selling stockholders" to sell their shares on the public market. On January 21, 2014, Lion filed an amended Form S-1 Registration Statement (effective January 30, 2014) with the SEC. *Id.* ¶ 196. It also published a January 30, 2014 Prospectus for a certain amount of shares of common stock being offered by certain Lion stockholders. *Id.* The amended Registration Statements and the Prospectus (together, the "January 30, 2014 Offering Documents") did not disclose Lion's promotional efforts or defendants' "involvement in reviewing, editing, and approving the promotional articles touting" Lion. *Id.* ¶ 197. The documents stated that the "market price of our stock may be adversely affected by market volatility." *Id.* ¶ 198. Plaintiff asserts that these "risk disclosures . . . were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that Lion was paying Lidingo to issue articles, often under aliases, designed to inflate the price of Lion common stock; and (ii) . . . Singh had directly reviewed, edited and approved some or all of the articles." *Id.* ¶ 199.

Also, in November 2013, Lion filed with the SEC its Form 10-Q for the quarter ending September 30, 2013. *Id.* ¶ 200. The Form 10-Q was certified by Singh and Handelman, who declared:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report;
>
> . . .
>
> 5. I have disclosed . . . to the registrant's auditors and the audit committee . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id.* ¶ 201. Plaintiff asserts that this form was materially false and misleading for similar reasons as the January 30, 2014 Offering Documents. *Id.* ¶¶ 200, 202.

4

In early 2014, two writers—Richard Pearson of *Seeking Alpha* and Adam Feuerstein of *TheStreet.com*—"exposed stock promotion schemes at Galena and [another biopharmaceutical company, the CytRx Corporation]." *Id.* ¶ 73. Their articles "set in motion a series of investigations and litigation that exposed Lidingo's role in over a dozen promotional schemes, including Lion's." *Id.* Additionally, the SEC opened an investigation into Galena's use of stock promotion companies. *Id.* ¶ 78.

On March 28, 2014, Lion filed its Form 10-K for the fiscal year ending on December 2013. *Id.* ¶ 203. This form was certified by Singh and Handelman, who again made the same declarations as listed above on the November 2013 Form 10-Q. *Id.* ¶¶ 203-204. Plaintiff asserts that this form was materially false and misleading for failing to disclose the payments to Lidingo to issue promotional articles and Singh's role in approving the articles. *Id.* ¶¶ 203, 205.

On May 14, 2014, Lion disclosed in its Form 10-Q for the first quarter of 2014 that it had received a subpoena from the SEC. *Id.* ¶¶ 85, 206. It stated,

> On April 23, 2014, the Company received a subpoena from the Securities [and] Exchange Commission (the "SEC") that stated that the staff of the SEC is conducting an investigation *In the Matter of Galena Biopharma, Inc. File No. HO 12356* and that the subpoena was issued to the Company as part of the foregoing investigation. Galena Biopharma is an unaffiliated, publicly-held biopharmaceutical company. In the Form 10-K that Galena Biopharma, Inc. filed with the SEC on March 17, 2014, Galena Biopharma stated that the SEC is investigating certain matters relating to Galena Biopharma and an outside investor-relations firm that it retained in 2013. The SEC's subpoena and accompanying letter do not indicate whether the Company is, or is not, under investigation. The Company has contacted the SEC's staff regarding the subpoena, and the Company is cooperating with the SEC.
>
> The subpoena requires the Company to give the SEC, among other materials, all communications between anyone at the Company and certain persons and entities (which include investor-relations firms and persons associated with the investor-relations firms), all documents related the listed persons and entities, all articles regarding the Company posted on certain equity research or other financial websites, and documents and communications related to individuals who post or have posted articles regarding the Company on equity research or other financial websites.

*Id.* ¶ 85. The form also included a section entitled "Risk Factors," which noted that the market price of Lion's common stock "may be adversely affected by market volatility," and listed certain factors that may cause fluctuation, but failed to disclose the alleged stock promotion scheme. *Id.* ¶ 207. The form was again certified by Singh and Handelman, who made the same declarations as

listed above on the November 2013 Form 10-Q. *Id.* ¶ 210. Plaintiff asserts that this form was also materially false and misleading. That same day, Feuerstein wrote an article "reporting the Lion filing and suggesting the existence of a widespread SEC investigation into stock promotion and small biopharma companies." *Id.* ¶ 86. After this, Lion's shares fell by $1.00 per share, or 10%. *Id.* ¶ 16.

Additionally, the Galena Board of Directors formed a Special Committee, which issued and later made public in September 2014 a report that "for the first time publicly implicated Lidingo as an entity involved in illegal stock promotion activities and specifically disclosed in detail Lidingo's improper conduct in paying bloggers for promotional articles about Galena." *Id.* ¶ 87.

On September 11, 2014, Lion filed a Post-Effective Amended No. 1 to Form S-1 Registration Statement, which amended the Form S-1 Statement declared effective on January 30, 2014, to include audited financial statements, and was signed by Singh and Handelman. *Id.* ¶ 212. On September 29, 2014, the SEC declared the Amended Registration Statement effective. *Id.* ¶ 213. The next day, Lion filed a September 30, 2014 Prospectus for a certain number of shares of common stock. *Id.* The September 11, 2014 Amended Registration Statement and the September 30, 2014 Prospectus (together, the "September 30, 2014 Offering Documents") did not disclose Lion's promotional efforts or defendants' involvement with the promotional articles. *Id.* ¶ 214. Plaintiff alleges that these documents were materially false and misleading.

On November 12, 2014, Lion issued a press release entitled "Lion Biotechnologies Announces Management Change," stating that Singh resigned for "personal reasons." *Id.* ¶ 89. Lion's share price declined by $0.75 per share, or over 11%. *Id.* ¶ 19. Two days later, Pearson published an article that "tied the Galena stock promotion scheme to Lidingo and Lion, and suggested that Singh was fired for his role in the scandal." *Id.* ¶ 90. Pearson also revealed a connection between Lion and Lidingo by discussing Lidingo's relationship with Lavos. *Id.* ¶ 91.

On April 10, 2017, the SEC issued a press release noting that it had "announced enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes that left investors with the impression that they were reading independent, unbiased

6

analyses on investing websites while writers were being secretly compensated for touting company stocks." *Id.* ¶ 92. The SEC also published cease and desist orders in connection with administrative proceedings against Lion, Singh, and Lavos for violations of securities laws. *Id.* ¶¶ 93, 94. Following this news, Lion's shares fell by $0.20 per share, or over 3% to close at $6.35 per share on April 10, 2017. *Id.* ¶ 22.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

Defendants Lion and Handelman move to dismiss each of the claims against them. Lion Mot. (Dkt. No. 69). Defendants Bjorlin and Singh have also filed separate motions to dismiss. *See* Bjorlin Mot. (Dkt. No. 62), Singh Mot. (Dkt. No. 71). Each defendant joins in parts of the other defendants' motions.

## I.     Timeliness of the Claims Against Bjorlin

Bjorlin asserts that all claims against her are time-barred under Nevada law. She argues that these claims are based on her alleged conduct as a member or manager of Lidingo, Bjorlin Mot. at 6-7. Lidingo was a Nevada limited liability company, *see* AC ¶ 32, and dissolved on October 14, 2014. Bjorlin Mot. at 7. The original complaint in this case was filed on April 14, 2017. Dkt. No. 1. The parties dispute whether California law or Nevada law governs the timeliness of plaintiff's claims.

However, even assuming Nevada law applies, the Court finds this issue inappropriate for resolution at this stage of litigation. Nevada law provides:

> The dissolution of a limited-liability company does not impair any remedy or cause of action available to or against it or its managers or members commenced within 2 years after the effective date of the articles of dissolution, with respect to any remedy or cause of action as to which, the plaintiff learns, or in the exercise of reasonable diligence should have learned of, the underlying facts on or before the date of dissolution of a limited-liability company or within 3 years after the date of dissolution with respect to any other remedy or cause of action. Any such remedy or cause of action not commenced within the applicable period is barred.

Nev. Rev. Stat. § 86.505(1). The two-year statute of limitation applies to any cause of action for which plaintiff learned or should have learned of the underlying facts by the date of dissolution, or October 14, 2014. The parties disagree on when plaintiff learned of the underlying facts, with plaintiff alleging that the alleged scheme was not fully disclosed until the SEC's April 2017 press release. This is a factual determination better suited for resolution at a later stage of this case. Thus, the Court DENIES Bjorlin's motion to dismiss on this ground.

## II.    Count One:  Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). A plaintiff asserting a claim under Section 10(b) or Rule 10b–5 must adequately allege six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Kelly v. Electronic Arts, Inc.*, 71 F.Supp.3d 1061, 1068 (N.D. Cal. 2014) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014)).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section 10(b) complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *Daou*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). As to scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. § 78u–4(b)(2); *Daou*, 411 F.3d at 1015.  Additionally, Federal Rule of Civil Procedure 9(b) requires a plaintiff who alleges fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requirement extends to securities fraud complaints. *Zucco Partners*, 552 F.3d at 990 (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)).

Defendants attack plaintiff's Rule 10b-5 claim as failing to properly plead three elements: (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation. The Court examines each argument below.

### A.    Material Misrepresentation or Omission

The statements and omissions in the complaint that are alleged to have artificially inflated Lion's stock price fall into two categories: (1) promotional articles; and (2) Lion's SEC filings. Defendants present several challenges to plaintiff's falsity allegations, including that defendants are not the makers of the promotional articles, the alleged omissions are not material, and defendants had no duty to disclose the alleged omissions.

### I.    Promotional Articles

Plaintiff alleges that defendants had at least fourteen promotional articles published touting Lion. AC ¶ 95. These articles are alleged to be materially false and misleading because "they each affirmatively misstated that the writers were not paid for the articles and/or failed to disclose that: (i) Lion had paid Lidingo to tout Lion's current performance and future prospects, often using aliases; and (ii) . . . Singh directly reviewed, edited and approved some or all of the articles prior to their publication." *Id.* ¶ 96. Defendants assert that the complaint fails to allege that they are the makers of the promotional articles, and that the alleged omission is not material. Lion Mot. at 19; Bjorlin Mot. at 7; Singh Mot. at 11 n.5.

### a.    "Maker" of Statements in the Promotional Articles

Rule 10b-5 makes it "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . ." in connection with the purchase or sale of securities. 17 CFR § 240.10b-5(b). Therefore, to be liable, defendants must have "made" the material misstatements or omissions. "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the

statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Supreme Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142-43. In other words, "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Id.* at 144.

Defendants argue plaintiff's allegations are insufficient to establish that either Singh or Bjorlin had ultimate authority over any of the alleged misrepresentations in the fourteen promotional articles. Defendants also argue that because there was no specific article attribution to either defendant, defendants cannot be said to have been the "makers" of the articles. Defendant Bjorlin argues the complaint does not allege she wrote or published any articles under the name Bjorlin. Defendant Sigh similarly argues that none of the promotional articles were attributed to him. *See* Bjorlin Mot. at 13, Singh Mot. at 11 n.5.

The Court finds this argument unpersuasive. "In the ordinary case, attribution is strong evidence a statement was made by the party to whom it was attributed." *Janus*, 564 U.S. at 143. However, "this case is not ordinary and the attributions within the articles are virtually meaningless." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1186 (D. Or. 2015) (finding the attribution contained within promotional articles written under a variety of aliases including Kingmaker and Wonderful Wizard was "not strong evidence that those aliases were the makers of the statements contained in the articles).

Here, the promotional articles were written under an array of pseudonyms. Some of the aliases used included "The Swiss Trader," "Glen S. Woods," and "John Rivers." AC ¶¶ 8, 36, 37, 45, 95. While these pseudonyms are not as obviously fantastical as Kingmaker or Wonderful Wizard, they nevertheless stand for an analogous principle- that the attribution contained within the articles themselves is not strong evidence those pseudonyms were the makers of the statements

contained in the articles. As alleged in the complaint, Lion was paying for promotional articles with an understanding those articles would not disclose their authors' compensation. Defendants had final say on what content the articles would include and when the articles would be published. Defendants also contributed substantially to the editing process. AC ¶¶ 95, 147. Defendants had ultimate authority over the articles' content and communication. *Janus*, 564 U.S. at 135 ("the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."). Here, defendants acted as both speechwriter and speaker. "Although the authors may be the ones who pressed 'send' …as alleged [defendants] are the persons who decided what content to include in the final article and whether any particular article would be published." *Galena*, 117 F. Supp. at 1187.

Next, defendants note that "[t]he lesson of *Janus* is that where legally distinct entities are involved, only one entity has the final say in what, if anything, is published." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1187 (D. Or. 2015). Defendants argue that both Singh (on behalf of Lion) and Bjorlin (who operated Lidingo) cannot have ultimate authority over the alleged statements. While this is correct, defendants ignore that plaintiff's allegations of ultimately authority exercised by Singh and Bjorlin are pled in the alternative. *See* AC ¶ 269. Therefore, the complaint does not run afoul of *Janus*.


### b. Materiality

Materiality is established when there is "a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered 'the total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S.Ct. 1309, 1318 (2011).

Defendants argue plaintiff's complaint fails to plead any misrepresentation or omission that is material. Defendants argue the promotional articles would not have significantly altered the mix of information available or have been sufficient, when viewed by a reasonable investor, to make any other statement misleading. In fact, defendants argue, "commercial analysts are

routinely paid to promote stocks." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257,

1275 (11th Cir. 2016).

Plaintiff counters by arguing each of the articles misrepresented or failed to disclose that the articles constituted paid advertisements and not the authors' true beliefs. Plaintiff points to the fact that the published articles offered no disclaimer and presented themselves as the unbiased, truthful representations of independent analysts when that was not the case. According to the complaint, all of the articles published on Seeking Alpha stated, "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it." AC ¶ 10.

The Court finds these alleged statements and omissions material. In *Galena*, the court parsed the issue of materiality in an analogous situation. There, the court found there was a substantial likelihood that a reasonable investor would have found the fact that, "the authors used false credentials, and that the authors were paid to tout Galena to alter the total mix of information." 117 F. Supp. 3d at 1189.

Here, the promotional articles were presented as the work of independent analysts with no connection to Lion. *see* AC ¶¶ 32, 102, 109, 115. However, Lion (through Lidingo) paid the authors to publish the articles with specific objectives in mind. The articles not only failed to disclose this paid relationship but contained affirmative misrepresentations, stating: "I wrote this article myself, and it expresses my own opinions. … I have no business relationship with any company whose stock is mentioned in this article." *Id*. ¶¶ 102, 109, 115, 129, 139, 163.

The Court finds there is a substantial likelihood that a reasonable investor would have found the fact that the authors of the articles were paid to promote Lion to alter the total mix of information. The numerous articles touting Lion did not disclose that they were part of a paid relationship. In addition, the authors of the articles "frequently wrote under aliases claiming to be credible investment professionals." AC ¶¶ 8, 45. In one instance, "Swiss Trader" claimed to be an "avid stock trader with a degree in Physics and an MBA in Finance." *Id*. In another, "Amy Baldwin" held herself out as a "current employee of a Fortune 20 company." *Id*. These fake profiles were concocted aliases used by Lidingo. These allegations create a substantial likelihood

United States District Court
Northern District of California

that a reasonable investor would have found the fact the authors were paid to promote Lion, as well as being untruthful about their backgrounds, would alter the total mix of information.

### 2. SEC Filings

Plaintiff also alleges that Lion's SEC filings, in particular its Sarbanes-Oxley certifications and risk disclosures related to possible market fluctuation, were misleading.

#### a. Risk Disclosures

A motion to dismiss for failure to state a claim will succeed "only when the documents containing the defendants' challenged statements include 'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the challenged statements were not misleading." *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM WMC, 2013 WL 5206216, at *28 (S.D. Cal. Sept. 13, 2013). Plaintiffs must plead with enough particularity to make the falsity or the misleading character of the statement plausible. *In re NVIDIA Corp. Sec. Litig.*, No. C 08-04260 RS, 2011 WL 4831192, at *4 (N.D. Cal. Oct. 12, 2011), aff'd, 768 F.3d 1046 (9th Cir. 2014).

Defendant listed nine factors in their May 14, 2014 Form 10-Q disclosure in a section titled "Risk Factors." AC ¶¶ 207, 208.

> The market price of our stock may be adversely affected by market volatility. The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including: announcements of the results of clinical trials by us or our competitors; developments with respect to patents or proprietary rights; announcements of technological innovations by us or our competitors; announcements of new products or new contracts by us or our competitors; actual or anticipated variations in our operating results due to the level of development expenses and other factors; changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates; conditions and trends in the pharmaceutical and other industries; general economic, political and market conditions and other factors; and the occurrence of any of the risks described in this Annual Report

*Id*. at 208. Plaintiff argues Lion's risk disclosures were materially false and misleading because they failed to disclose Lion was paying Lidingo to publish articles with the aim of boosting the market price of Lion's common stock. Plaintiff alleges Lidingo's retention was a "surreptious

scheme [designed] to boost the Company's shares with paid promotional articles as one such factor, rendering those statements misleading." Opp. (Dkt. No. 77).

Defendant counters by noting the disclosure made note of factors including but not exclusively limited to the list of items. Lion Mot. (Dkt. No. 69). In addition, defendants argue plaintiff pleads no fact that would make these statements false or misleading. Defendants' argue that plaintiff's "omission theory" fails because an alleged lack of completeness is not actionable. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 881 (9th Cir. 2012) (finding the subsequent release of information concerning side effects was not false or misleading).

The Court finds that by failing to mention the promotional articles, defendants misled investors. *See Ansell v. Laikin*, No. CV 10-9292 PA AGRX, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011) ("[B]y failing to mention his scheme but listing several other risks in the 'questions and answers' section of the Tender Offer, Defendant misled investors into believing that the Tender Offer had disclosed all known risks of investing in the Company."). Lion disclosed reasons why its stock might fluctuate, but failed to disclose that Lion was engaged in a promotion scheme intended to manipulate the price of its common stock. The risk disclosures were not vague, generalized statements. They were specific, particularized showings that demonstrate the omission of this particular risk disclosure was not wholly innocent. The Court finds that the risk disclosures did not adequately disclose the risks involved and in doing so misled investors.

### b.    Sarbanes-Oxley

"In general there is no duty to disclose a fact in the offering documents 'merely because a reasonable investor would very much like to know that fact that fact.'" *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (quoting *In re Time Warner*, 9 F.3d at 267). "But disclosure is required ... when necessary 'to make ... statements made, in light of the circumstances under which they were made, not misleading." *Id.*

Plaintiff argues that defendants' Sarbanes-Oxley certifications contain material misrepresentations and omissions because they failed to present a complete picture of Lion's financial condition. Plaintiff alleges defendants knew but failed to disclose Lion had hired

15

Lidingo to publish articles touting Lion stock. Plaintiff notes that defendant's Sarbanes Oxley certifications "represented they had evaluated a set of internal controls and disclosed fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." *See* AC ¶¶ 201, 204, 210.

Defendants argue that under Section 10(b), Lion's obligation was not provide complete information but only to refrain from providing misleading information. Lion Mot. (Dkt. No. 69). Defendants posit the disclosure was not misleading. *Id.*

The Court finds Lion's Sarbanes-Oxley certifications actionable. The certifications failed to provide a sufficient litmus test by which a reasonable investor might determine the company's financial standing. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[T]o be actionable under the securities laws, an omission must be misleading ... it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability"). Defendants were, at the time of the certification, engaged in pay for promotion scheme designed to inflate their common stock and mislead investors. A reasonable investor would likely have found the fact that the articles touting Lion, easily accessible and apparent on the internet, were not in fact unbiased recommendations but rather paid promotions. Thus, the Court DENIES defendants' motion to dismiss on these grounds.

## B.    Scienter

Defendants argue that plaintiff failed to sufficiently plead scienter. "To adequately plead scienter, the complaint must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Zucco Partners*, 552 F.3d at 991 (citing 15 U.S.C. § 78u–4(b)(2)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 324 (2007). "To adequately

demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (internal quotation marks and citation omitted).

The Supreme Court has explained that the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

### 1.    Singh

Defendant Singh was former Chief Executive Officer ("CEO") of Lion from July 24, 2013 to December 31, 2014. Singh argues the complaint is devoid of particularized facts suggesting Singh intended to mislead or was reckless in not knowing that he was misleading investors about materially false or misleading statements. Singh Mot. (Dkt. No. 71). Singh argues that the fact he "edited, reviewed, or came up with ideas for articles does not in itself support the claim that he sought to mislead investors about Lion's prospects." *Id.*

Plaintiff counters that the complaint pleads evidence of Singh's "direct knowledge of the promotional scheme." Opp. (Dkt. No. 77). Specifically, plaintiff points to the fact that on several occasions Singh refused to allow authors to disclose their affiliation with Lion. *See* AC ¶¶ 47, 48.

Here, the Court finds the complaint sufficiently alleges facts giving rise to an inference of scienter. The complaint details numerous allegations that demonstrate Singh knew and was complicit in the promotional scheme, and took affirmative steps to ensure that the scheme did not come to light. The complaint also alleges Singh corresponded at some length with Lidingo, signed a contract with Lidingo, reviewed draft articles from Lidingo, approved the articles prior to publication, was aware the articles were part of a paid promotion, and knew that the articles did

17

not contain the required disclosures that the authors were paid. *See* AC ¶¶ 6, 7, 8, 9, 10; *see also Galena*., 117 F. Supp. 3d 1165 (holding in a similar stock promotion scheme, a strong inference of the CEO's scienter for reasons including correspondence concerning the promotional scheme, evidence of a contract regarding the promotion scheme, as well as editing and reviewing of the promotional articles). In one particular instance, when a prospective writer wanted to disclose compensation, Singh confirmed there was a no disclosure policy. In another, Singh recommended that Bjorlin tell a writer not to disclose compensation because this would "create a red flag for investors." *See* AC ¶¶ 48.

The particularized factual allegations pertaining to Singh's knowledge and conduct support a strong inference that Singh knew, or was at a minimum deliberately reckless as to the fact that Lidingo as using illegitimate means to inflate Lion's stock price and that the relationship violated securities laws.

### 2. Bjorlin

Defendant Bjorlin organized and operated the stock promotion company Lidingo. Bjorlin argues that an inference of scienter is improper because the claim impermissibly lumps defendant Bjorlin together with the other defendants. Defendant argues that Bjorlin's scienter is pled through a single, conclusory allegation and that plaintiff fails to allege facts indicating Bjorlin was aware of *Seeking Alpha's* disclosure policy.

Plaintiff counters that at all relevant times Bjorlin was the only managing member of Lidingo, and as part of her duties she was responsible for coordinating the publication of over 400 promotional articles, primarily on *Seeking Alpha*. Plaintiff argues it is "implausible to believe that she was not aware of…[the] policy not to disclose." Opp. (Dkt. No. 77).

Here, the complaint details specific instances with in which Bjorlin told various writers that they were not to disclose compensation. *See* AC ¶¶ 47, 48, 49. The particularized allegations demonstrate Bjorlin had direct knowledge of and was complicit in the non-disclosure policy. In one instance, Bjorlin wrote to Singh stating, "the idiot we used in the beginning, he will not post a disclosure again." *See* AC ¶ 46. In another, Bjorlin wrote "you will not be able to disclose that

you are being paid to write." *See* AC ¶ 49.

Furthermore, the complaint alleges with sufficient detail that Bjorlin had reason to tout the stock as her compensation was linked to Lion's stock. Bjorlin invested $100,000 in Lion and owned 150,000 shares of Lion common stock. In addition, Lidingo was paid (in part) with 50,000 shares of Lion stock as part of the arrangement. *See* AC ¶¶ 66, 226. The Court finds the complaint sufficiently alleges facts giving rise to an inference of scienter.

### 3. Handelman

Defendant Handelman was the former Chief Financial Officer ("CFO") of Lion from February 7, 2011 to June 8, 2015. Plaintiff asks the Court to apply the core operations doctrine in finding scienter as to Handelman. Plaintiff argues that the context of the allegations raise a strong inference of scienter to Handelman, primarily because of the small size of the company as well as the important of the promotional scheme to the company. Plaintiff also notes that Handelman signed Lion's Sarbanes-Oxley certification.

Defendant counters by arguing the complaint does not allege Handelman was involved with (or even discussed) the articles. Defendant posits management's general knowledge and awareness of day to day activities does not establish scienter. Handelman also argues that he did not know Singh entered into a contract with Lidingo to write promotional articles.

Under the core operations theory, scienter may be imputed "based on the inference that key officers have knowledge of the 'core operations' of the company." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014). "[I]n 'rare circumstances' allegations regarding management's role 'may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.'" *Id.*

The Court finds the complaint adequately alleges that Handelman knew Lidingo was publishing promotional articles in a misleading fashion without the required disclosures. Accordingly, the Court finds that the allegations as they pertain to Handelman are sufficient to determine a finding a scienter.

As CFO of Lion, Handelman was in charge of financial reporting, accounting, and billing. In addition, Singh and Handelman were the only full time Lion employees at the beginning of the Class Period. While the company subsequently expanded, Lion never employed more than fourteen employees.

The Court finds that it is absurd to suggest Handelman did not know of the relationship with Lidingo. Here, plaintiff alleges a pervasive scheme affecting the (in part) heart of the company's core operation, namely that the strength of Lion's stock was critical to the company's success. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (applying the core operations doctrine in a case where the CEO and CFO made materially false statements regarding the company's revenue by including backlog reports for which the government had ordered stop work orders, halting millions of dollars of the company's work); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) (applying the core operations doctrine in a case where the CEO and CFO could not have been unaware of the non-compliant conditions of their manufacturing and control division primarily because of the allegations struck at the heart of the company and because of repeated warning letters from the FDA).

As plaintiff alleges in the complaint, the core concerns of Lion's management included "raising funds and increasing stock price and volume." *See* AC ¶ 228. Furthermore, considering Handelman's position at the company, it blinks reality to suggest Handelman did not understand, inquire into, or partake in Lion's $240,000 contract with Lidingo or the transfer of 50,000 shares of unregistered common stock to Lidingo. *See* AC ¶ 229.

### 4.    Lion

"[C]orporate scienter relies heavily on the awareness of the directors and officers." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir.2008) (quotation marks and citation omitted). The Court has already found that plaintiffs have adequately alleged the scienter of Singh, who was an officer of Lion, and Singh's knowledge can be imputed to Lion. Thus, plaintiff has sufficiently plead scienter of Lion.

Thus, the Court DENIES defendants' Bjorlin, Singh, Handelman, and Lion's motions to dismiss on these grounds.

### C.     Loss Causation

Defendants argue that plaintiff failed to plead facts establishing loss causation. Loss causation is the "causal connection between the material misrepresentation and the [plaintiffs'] loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). At the pleading stage, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (2008) (quoting *Dura*, 544 U.S. at 347, 125 S.Ct. 1627). Stated another way, "a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known." *In re Immersion Corp. Sec. Litig.*, No. C 09–4073 MMC., 2011 WL 6303389 at *10 (N.D.Cal. Dec. 16, 2011). "Although a securities fraud plaintiff need not allege an outright admission of fraud to survive a motion to dismiss, the mere 'risk' or 'potential' for fraud is insufficient to establish loss causation." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (internal quotation marks omitted). Plaintiffs need not prove loss causation to survive a motion to dismiss, but they must properly allege it. *Metzler*, 540 F.3d at 1062.

Plaintiff's loss causation allegations rely on three announcements made on May 14, 2014, November 12, 2014, and April 10, 2017, respectively. AC ¶ 247. Plaintiff alleges that these announcements were partial corrective disclosures or "materializations of the foreseeable risks concealed by [d]efendants' fraud." *Id.* Defendants argue that the 2014 announcements do not reveal the alleged misrepresentations or scheme, and that the 2017 announcement did not trigger a "statistically significant" stock price drop. Lion Mot. at 5.

On May 14, 2014, Lion's Form 10-Q disclosed that it received a subpoena from the SEC as part of the investigation *In the Matter of Galena Biopharma Inc.* AC ¶ 248. The disclosure noted that Galena was an unaffiliated entity; that the SEC was "investigating certain matters relating to Galena . . . and an outside investor-relations firm that it retained in 2013"; and that the

United States District Court
Northern District of California

subpoena and accompanying letter did not indicate whether Lion was under investigation. *Id.* The subpoena required Lion to give the SEC "all communications between anyone at [Lion] and certain persons and entities (which include investor-relations firms and persons associated with the investor-relations firms), all documents related to the listed persons and entities, all articles regarding [Lion] posted on certain equity research or other financial websites, and documents and communications related to individuals who post or have posted articles regarding [Lion] on equity research or other financial websites." *Id.* Based on this disclosure, Feuerstein wrote an article that day, titled "SEC Casting Wide Net in Investigation," asking why Lion had received a subpoena. *Id.* ¶ 249; Lion RJN, Ex. E (Dkt. No. 70-5). Feuerstein wrote that he had a theory, "just speculation": Lion's CEO Singh was previously CEO of IMUC, which was a client of the same stock promotion firm that Galena used, called the DreamTeam. Lion RJN, Ex. E. Galena and Lion also shared a board member. *Id.* Galena allegedly paid the DreamTeam to engage in a stock-promotion campaign, including publishing articles under false names and not disclosing compensation. *Id.* That day, Lion's share price declined by 10.9%, and continued to decline over the next two days for a total decline of over 16%. AC ¶ 251.

On November 12, 2014, after the close of trading, Lion issued a press release titled "Lion Biotechnologies Announces Management Change," which stated that Singh resigned for "personal reasons." *Id.* ¶ 253; Lion Reply RJN, Ex. A (Dkt. No. 80-1). The press release did not discuss the alleged stock promotion activities. Lion Reply RJN, Ex. A. Two days later, Pearson published an article titled "More Fallout From Stock Promotion Scandal," which plaintiff contends suggested Singh was fired for his role in the stock promotion scheme. AC ¶ 254; Lion RJN, Ex. F (Dkt. No. 70-6). The article referred to the "scandal" of undisclosed stock promotions by the DreamTeam for CytRX and Galena. Lion RJN, Ex. F. It then stated:

> As it turns out, the fallout is not yet done. It looks like there are additional companies . . . which are being impacted. The most obvious one is Lion Biotechnologies . . ., which disclosed that it had been subpoenaed in April in connection with the SEC's investigation of Galena.
>
> Following an internal investigation at Galena, CEO Mark Ahn "resigned" for personal reasons. More recently, Lion Bio's CEO Manish Singh just announced that he is also resigning for "personal reasons." As we will see . . ., it may be more complicated than this.

22

*Id.* Pearson went on to note that: the special committee investigating Galena found that Lidingo engaged in improper promotional activity for Galena; and Lavos, a stock promotion company run by Singh's wife, had a similar contract with a contract to the contract that Lidingo had with Galena. *Id.* Pearson noted that Lion's stock price fell after Singh's resignation, and stated, "The point is that for any of the companies which have had involvement in the stock promotion scandal, there is likely to be a combination of further downside and/or limited upside in the share prices." *Id.* On November 12, 2014, Lion's share price fell 11.2%, and continued through November 14, 2014, for a total decline of 12%. AC ¶ 257.

On April 10, 2017, the SEC issued a press release that it had "announced the enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes that left investors with the impression they were reading independent, unbiased analyses on investing websites while writers were being secretly compensated for touting company stocks." *Id.* ¶ 259. It also published cease-and-desist orders in connection with administrative proceedings against Lion, Singh, and Lavos for violations of securities laws. *Id.* ¶ 260. The order against Lion provided that Lion, through Singh, engaged Lidingo "to publish articles about Lion on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes," and that such promotional publications "purported to be independent from the company when, in fact, they were paid promotions." *Id.* It further stated that Singh "understood that Lidingo was using writers who would not disclose that Lion was indirectly compensating them for their publications." *Id.* That day, Lion's stock price declined by 3%, and continued to decline over the next two trading days, for a total decline of 5.4%. *Id.* ¶ 262.

Defendants assert that the May 14, 2014 disclosure of the SEC subpoena does not constitute a corrective disclosure because it does not reveal the alleged fraud. They also assert that the November 12, 2014 disclosure of Singh's resignation plus the subsequent article is insufficient raised at most speculation about potential risks, and note that the alleged loss could also be from Lion's November 13, 2017 Form 10-Q, which defendant's claim revealed a 'precarious financial position." Lion Mot. at 9-11. Lastly, defendants argue that the April 10, 2017 disclosure does not

establish loss causation because plaintiff fails to plead a "significant stock price decline" after this disclosure.

A plaintiff may sufficiently plead loss causation "by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). But "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). "[A] plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Id.* As the Ninth Circuit has explained, "the announcement of an investigation, standing alone, is insufficient to establish loss causation." *Loos v. Immersion Corp.*, 762 F.3d 880, 883 (9th Cir. 2014), as amended (Sept. 11, 2014). However, "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." *Lloyd*, 811 F.3d at 1203. "[N]o stock price drop need accompany the subsequent corrective disclosure." *Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (citing *Lloyd*, 811 F.3d at 1210).

In *Lloyd*, the defendant allegedly represented that there were "no serious doubts" about its largest borrower's ability to repay its loans. 811 F.3d at 1202. The defendant then announced it had received an SEC subpoena concerning its lending practices, and its stock price declined by 22%. *Id.* at 1204. Several analysts noted a potential relationship between subpoena and the largest borrower's loans. *Id.* A month later, the defendant announced that the borrower could not repay its loans, but the market "reacted hardly at all to [defendant's] bombshell disclosure about its largest borrower." *Id.* at 1205, 1210. The Ninth Circuit held that the announcement of an SEC investigation related to an alleged misrepresentation, combined with a subsequent corrective disclosure, could sufficiently plead loss causation. *Id.* at 1203. It concluded that, when "viewed

together with the totality of the other alleged partial disclosures," the complaint adequately pled loss causation. *Id.* at 1210-11.

Here, as in *Lloyd*, the totality of the alleged partial disclosures sufficiently pleads loss causation. The complaint plausibly alleges that: (1) Lion's disclosure of the subpoena caused its stock price to drop; (2) online writers perceived the subpoena to the SEC casting a wide net in investigating improper stock promotion activities; (3) Singh resigned a few months after disclosure of the subpoena; (4) online writers perceived his resignation as related to the stock promotion scandal that was exposed at other companies; (5) the market's fears about the subpoena and Singh's resignation were confirmed by the SEC's cease-and-desist orders to Lion and Singh; and (6) the minimal effect on Lion's stock price following the SEC's announcement of alleged improper conduct by Lion indicates that the earlier drops after the other partial disclosures reflected, at least in part, the market's concerns about the alleged stock promotion scheme. *See Lloyd*, 811 F.3d at 1210-11. "Whether the stock drop was [instead] due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *Robb v. Fitbit Inc.*, 216 F.3d 1017, 1033 (N.D. Cal. 2016). Thus, plaintiff has adequately pleaded "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342.

Defendants' arguments to the contrary and cited case are unconvincing. In *Rok v. Identiv*, the court found that the plaintiffs had failed to plead loss causation under *Lloyd*. *See* 2017 WL 35496, at *19-20. The alleged partial disclosures included an internal investigation into a complaint by a former employee alleging misappropriation of corporate funds, the resignation of the company's independent accounting firm, and an amendment to the company's 2014 Annual Report adjusting an executive's compensation. *Id.* at *2, 3, 17-18. The court held that the complaint failed under *Lloyd* because *Lloyd* involved a "bombshell disclosure about [the company's] largest borrower" that was contrary to the company's earlier representation, but the *Rok* complaint did not allege an analogous subsequent correction. That is not the case here: the subsequent disclosure of the SEC's cease-and-desist orders confirmed that the earlier subpoena related to improper stock promotion activities.

Moreover, defendants assert that *Lloyd* is distinguishable because the subpoena in this case was related to an investigation of another company, and there is a 3-year gap between the first corrective disclosure and the final corrective disclosure. However, as plaintiff correctly notes, the subpoena was directed at Lion's own stock promotion activities, requiring Lion to produce "all communications between anyone at [Lion] and . . . investor-relations firms and persons associated with the investor-relations firms . . . ." *See* AC ¶ 248. Also, defendant has pointed to no authority finding that a subsequent disclosure must occur within a certain timespan after the initial disclosure. Thus, plaintiff has adequately pled "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. "Whether [plaintiff] can establish that causal connection is another question." *Lloyd*, 811 F.3d at 1211. Thus, the Court DENIES defendants' motion to dismiss on this ground.

### III.    Count Two: Violation of Section 10(b) of the Exchange Act and Rule 10(b)(5)(a)&(c) Against Lion, Singh, and Bjorlin

"Under Rule 10b–5(a) or (c), a defendant who uses a 'device, scheme, or artifice to defraud,' or who engages in 'any act, practice, or course of business which operates or would operate as a fraud or deceit,' may be liable for securities fraud." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *Id.*[2]

To allege a claim for scheme liability, a plaintiff must allege the elements of a securities fraud claim. Rules 10b–5(a) and (c), however, prohibit manipulative or deceptive acts, versus

---

[2] Claims under Rule 10b5–(a) and (c) are generally referred to as claims for "scheme liability." Scheme liability claims are distinct from claims under Rule 10b–5(b). Rule 10b–5(b) claims are based solely on deceptive statements or omissions, whereas scheme liability claims involve deceptive conduct, which may include deceptive statements or omissions but must also include additional conduct. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015)

material misrepresentations or omissions. Thus, to state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged deceptive or manipulative act; (5) economic loss; and (6) loss causation. *Galena*, 117 F. Supp. 3d at 1192. Lion, Singh, and Bjorlin move to dismiss plaintiff's scheme liability claim, arguing that it merely "recasts" plaintiff's Rule 10b-5 claim.

Plaintiff alleges that defendants Lion, Singh, and Bjorlin carried out a plan or scheme that was intended to, and did, deceive the investing public and cause plaintiff and others to purchase or sell Lion's securities at artificially inflated and distorted prices. AC ¶ 279. In particular, the complaint alleges defendants engaged in the following acts: "(i) making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lion and its business operations and financial condition in light of the circumstances under which they were made, not misleading, (ii) hiring Lidingo to promote Lion; (iii) paying Lidingo $20,000 a month and 50,000 shares of unregistered securities; (iv) paying writers, through Lidingo, to write promotional articles about Lion; (v) concealing writers' compensation or relationship with Lidingo or Lion from investors; (vi) using pseudonyms to conceal author's identities; and (vii) reviewing and approving the promotional articles." *Id.* ¶ 281.

Here, plaintiff does not merely recast the Rule 10b-5(b) claims. Rather, plaintiff's allegations detail deceptive, actionable conduct that may constitute scheme liability. Plaintiff alleges additional conduct, including specific instances in which the company's executive officers "edited, approved, and controlled the content of articles before payment and publication." Opp. (Dkt. No. 77); *see e.g.,* AC.

This additional conduct beyond mere statements raises an inference of scheme liability. "While the purported scheme certainly involved allegedly false and misleading statements, it also included conduct beyond said statements, including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock

and raise revenue, and covering up the Company's involvement." *In re CytRx Corp. Sec. Litig.*, No. 14-cv-1956, 2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015). Plaintiff's complaint alleges the articles "were written under different aliases without disclosing that the companies controlled the content and paid for the articles." Opp. (Dkt. No. 77). Plaintiff's complaint also details a lucrative agreement between Lion and Lidingo. AC ¶ 66.

This alleged conduct is distinct from the alleged misrepresentations and omissions and is sufficient to allege a claim for scheme liability. *Galena*, 117 F. Supp. 3d at 1194; *see also In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015) (finding scheme liability did not merely recast misstatement or omission claims when the purported scheme "also included conduct beyond said statements, including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement"); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (finding scheme liability when defendants' "actions manipulating the studies (as opposed to their statements)—had the effect of artificially propping up Medtronic stock prices on account of confidence in … sales"); *JAC Holding Eters., Inc. v. Atrium Capital Partners, LLC,* 997 F.Supp.2d 710, 735 (E.D.Mich.2014) (finding scheme liability when the conduct was "not just specific false statements ... but also the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value...."); *S.E.C. v. Curshen,* 888 F.Supp.2d 1299, 1308 (S.D.Fla.2012) (finding scheme liability when one defendant "orchestrated the false media campaign" surrounding the company, which included "arranging for the posting of a false website" touting company developments and issuing press releases claiming fictitious achievements); *Swack v. Credit Suisse First Boston, 383 F.Supp.2d 223, 239 (D.Mass.2004)* ("[The plaintiff] has alleged not just that Wolfenberger issued one or two misleading research reports, but rather that over time he worked extensively with Dachis to issue bullish research reports (and 'work' Razorfish stock in conference calls and elsewhere) with the deliberate aim of boosting Razorfish's market price artificially.").

The fact that some of these alleged acts are closely connected to the alleged misrepresentations and omissions or that the alleged conduct was not disclosed until the alleged scheme unraveled does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim. *Galena*, 117 F. Supp. 3d at 1194). Defendants engaged in conduct intended to affect Lion's common stock price by "stimulating activity that does not reflect genuine investor demand." *Santa Fe,* 430 U.S. at 476–77, 97 S.Ct. 1292; *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Accordingly, the Court DENIES defendants' motion to dismiss on this ground.

## IV. Count Three:  Violations of Section 20(a) of the Exchange Act Against Singh and Handelman

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons." 15 U.S.C. § 78t(a). In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under ... this chapter ... shall also be liable ... to the same extent as such controlled person." *Galena*, 117 F. Supp. 3d 1199.

Control is defined by the SEC as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *see also Howard,* 228 F.3d at 1065 n.9. To establish "controlling person" liability, the plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). In general, the determination of who is a controlling person for purposes of liability under 15 U.S.C. § 78t is an intensely factual question. *Arthur Children's Tr. v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993). Furthermore, the plaintiff need not show the controlling person's scienter or that they "culpably

participated" in the alleged wrongdoing. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

Here, plaintiff asserts control liability claims against Singh and Handelman. Singh joins in Handelman's motion. Defendant Handelman argues that the complaint contains no allegations that Handelman was involved with or knew about the promotional articles, and by extension, could not have had responsibility for disclosing the stock promotion activities in Lion's public filings. Lion Mot. at 20-21.

Plaintiff argues that the complaint alleges Singh and Handelman, as Lion's CEO and CFO, "had direct and supervisory involvement with the day to day operations of Lion, were provided with copies of the Company's reports, press releases, public filings and other statements alleged to have been false or misleading prior to and/or shortly after these statements were issues, and had power to influence and control Lion's public statements." Opp. (Dkt. No. 77) at 49. The complaint also notes that Singh and Handelman signed the company's SEC filings. AC ¶¶ 28-29.

Defendants argue that that the complaint's allegations are conclusory. Defendants argue plaintiff has not pled facts establishing defendant made materially false or misleading statements and cannot satisfy the power or control requirement. Defendant argues plaintiff cannot allege that defendants were involved with, had power over, or even knew about the challenged articles.

Allegations of day-to-day oversight of a company's operations and involvement in the statements at issue have been found sufficient to presume control over the transactions giving rise to alleged securities violations by that company. *Galena*, 117 F. Supp. 3d 1145, 1200 (D. Or. 2015). "Accordingly, although a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." *Arthur Children's*, 994 F.2d at 1397. Whether a defendant is a control person is an intensely factual question, and a plaintiff will survive a motion to dismiss on allegations that individual defendants, by virtue of their position, could and did control and influence the company." *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *12 (W.D. Wash. Dec. 29, 2008); *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) ("persuasive authority indicates that an officer or director who has signed financial statements containing materially false or misleading statements qualifies

as a control person.").

The Court has found that plaintiff sufficiently alleges a primary securities law violation by both Singh and Handelman. Thus the Court considers whether plaintiff sufficiently alleges that the defendants are control persons of Lion.

Plaintiff alleges that Singh and Handelman, as CEO and CFO, had direct and supervisory involved in the day to day operations of Lion, were provided with copies of the Company's reports, press releases, public findings, and other statements alleged to have been false or misleading, had the power to influence these statements, and signed SEC filings. These allegations demonstrate the requisite control over Lion's day to day operations. Plaintiff further alleges that Singh was CEO during the class period, and in addition alleges Singh was involved in the hiring, paying, and firing of Lidingo. Furthermore, Singh signed allegedly false and misleading documents with the SEC. Accordingly; plaintiff sufficiently alleges that Singh had authority both over the management and policies of Lion and over the primary violations of both the allegedly false and misleading statements and the alleged scheme.

As to Handelman, the Court determines that this is a factual determination better suited for resolution at a later stage of this case. While the small size of the company and Handelman's high position at Lion raise the inference of control liability, the Court finds that the intensely factual nature of this inquiry is best suited for resolution at a later stage. *In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *17 (concluding that "control person liability claims can generally only be dismissed at the pleading stage if a plaintiff fails to adequately plead a primary violation) (citing *Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *41–42 (C.D. Cal. Aug. 7, 2014)). Thus, the Court DENIES defendants' motion to dismiss.

## V.  Counts Four & Five : Violations of Section 11 and Section 12 of the Securities Act

Section 11 of the Securities Act of 1933 imposes liability on issuers, underwriters, and other participants in a public securities offering for any material misstatement of fact or material omission in the registration statement. 15 U.S.C. § 77k. Section 11(a) provides that where a material fact is misstated or omitted from a registration statement accompanying a stock filing

with the SEC, "any person acquiring such security" may bring an action for losses caused by the misstatement or omission. *Id*. § 77k(a). As with Section 10(b) of the Exchange Act, Section 11 of the Securities Act "require[s] a plaintiff adequately to allege a material misrepresentation or omission." *In re Stac Electronics Secs. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996) (citation, internal quotation marks, and alteration omitted). "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Id.* (citing *Kaplan*, 49 F.3d at 1371).

Section 12(a)(2) imposes liability on any person who "offers or sells a security" by means of a materially false and misleading prospectus. 15 U.S.C. § 77*l*(a)(2). This "encompasses both direct sellers who pass title of the subject securities and indirect sellers who 'successfully solicit[ ] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner.'" *Mallen v. Alphatec Hldgs., Inc.*, 861 F. Supp. 2d 1111, 1131 (S.D. Cal. 2012) (quoting *Pinter v. Dahl,* 486 U.S. 622, 644 n.21, 647 (1988)).

Defendants argues that plaintiff lacks statutory standing to bring his Section 11 and 12 claims because he fails to allege that he bought shares (or can trace his shares to) the September 30, 2014 offering. Defendants also argue that plaintiff fails to identify a materially false or misleading statement in the Registration Statement or Prospectus. Having already addressed, *inter alia*, defendants' claims that plaintiff's complaint lacks materially false or misleading information, the Court addresses standing in both Section 11 and Section 12(a)(2).

### 1.    Section 11

Standing to pursue a Section 11 claim is limited to persons who "have purchased stock in the offering at issue, or [can] trace later-purchased stock back to that offering." *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1022 (N.D. Cal. 2011). To establish standing as a pleading matter, plaintiffs must do more than simply state in conclusory terms that their shares are "directly traceable" to the offering at issue. *Id.* Rather, they must plead facts from which a court may "reasonably infer" that this is the case. *Id.*

Defendants argue that Lion did not sell securities to investors pursuant to the 2014 Registration Statement or Prospectus. Rather, Lion argues that the Registration Statement was intended to enable private placement purchasers to sell their shares on the public market. Lion argues that here, plaintiff attempts to bring a Section 11 claim based on the purchase of shares of a secondary offering (meaning, an offering that takes place when the issuer already has shares on the public market). Lion argues that plaintiff must demonstrate he purchased the shares from the pool of shares in the offering rather than from previously issued shares. Lion argues that the complaint fails to specifically allege plaintiff's shares are directly traceable to the offering at issue.

Here, the complaint alleges that plaintiff purchased his shares pursuant to the September 2014 offering documents. This included the amended registration statement and prospectus. AC ¶¶ 214, 311. Plaintiff states that he purchased 1,000 shares the day after the September 2014 offering and an additional 2,400 shares on the following day. *AC, Exhibit A*. Plaintiff alleges that the September 2014 offering included nearly 45%, or 21 million shares, of the total outstanding common stock. Plaintiff argues that because there were only two public offerings during the class period (January 2014 and September 2014), it is more likely than not that plaintiff purchased his shares in the September 2014 offering.

The Court finds that plaintiff has not sufficiently traced its stock to the offering at issue, nor has he alleged facts from which or methods by which he will later be able to do so. Accordingly, the Court GRANTS defendants' motion to dismiss, with leave to amend.

### 2. Section 12

Section 12(a)(2) imposes liability on any person who "offers or sells a security" by means of a materially false and misleading prospectus. 15 U.S.C. § 77*l*(a)(2). This "encompasses both direct sellers who pass title of the subject securities and indirect sellers who 'successfully solicit[ ] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner.'" *Mallen v. Alphatec Hldgs., Inc.*, 861 F. Supp. 2d 1111, 1131 (S.D. Cal. 2012) (quoting *Pinter v. Dahl,* 486 U.S. 622, 644 n.21, 647 (1988)). It is well-settled that "[w]hether or not defendants actually solicited plaintiffs' sales is a factual question which should

generally be left to the jury." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (further noting, "at this stage plaintiffs['] need only satisfy Rule 8(a)'s lenient pleading standards").

Lion argues that plaintiff's Section 12(a)(2) claim fails because Lion is not within the group of defendants against whom such claims maybe brought. Lion notes that plaintiff has not pled facts demonstrating his purchase is tied to the September 2014 Registration Statement. As stated above, this Court finds that plaintiff has not sufficiently asserted standing to assert its Section 12 claim.

Defendant also argues that liability under Section 12(a)(2) is confined to persons offering or selling through a misleading prospectus. Defendant notes that liability is confined to immediate sellers or those who directly solicit the sale of securities for their own financial gain. Defendant argues plaintiff cannot plead facts categorizing Lion as either because the securities were held not by Lion but by a private placement purchaser.

The Court finds that plaintiff has not sufficiently traced his purchase. Accordingly, the motion is GRANTED, with leave to amend.

## VI. Count Six: Violations of Section 15 of the Securities Act Against Singh and Handelman

Control person liability under both Sections 15 of the Securities Act and 20(a) of the Exchange Act requires: (i) "a primary violation of the securities laws"; and (ii) "control over a primary violator." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008). "A person exercises control over an issuing corporation when he or she oversees day-to-day company operations." *Id.* "In general, the determination of who is a controlling person . . . is an intensely factual question." *Kyung Cho v. UCBH Hldgs., Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (alteration in original).

Defendants argue plaintiff's claim fails for lack of a primary violation. Plaintiff counters by reiterating that Singh and Handelman had direct and supervisory involvement in the day to day operations of Lion, were provided with copies of the Company's reports, press releases, public

filings and other statements alleged to have been false or misleading prior to and shortly after these statements were issued, and had the power to influence and control Lion's public statements.

As discussed above, inter alia, the Court concludes that at this stage of the pleadings sufficient control person liability has been alleged for both Singh and Handelman. *In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *18 (C.D. Cal. July 13, 2015) ("We too conclude that there is at least a reasonable and plausible inference of control at this stage in the proceedings, especially since all of the Director Defendants are also subject to primary liability for Securities Act violations.").

Accordingly, defendants' motion to dismiss in denied.

## CONCLUSION

For the foregoing reasons, defendants' motions are GRANTED IN PART and DENIED IN PART. (Dkt. Nos. 62, 69, 71).

**IT IS SO ORDERED**.

Dated:  February 15, 2018

_____
SUSAN ILLSTON
United States District Judge